**Ex Parte Wesley Ronald TULEY, Applicant.**

**No. 74364.**

Court of Criminal Appeals of Texas.

Dec. 18, 2002.

Opinion on Denial of Rehearing
July 2, 2003.

Michael Levine, James Lee Bright, Dallas, Keith Hampton, Austin, for Appellant.

Laura Anne Coats, Asst. DA, Dallas, Matthew Paul, State's Atty., Austin, for State.

## OPINION

PRICE, J., delivered the opinion of the Court, in which MEYERS, JOHNSON, HOLCOMB and COCHRAN, JJ., joined.

■ After the applicant's jury was deadlocked on the question of guilt in his

trial for aggravated sexual assault, the applicant pleaded guilty to the charge. Years later, the complainant in the case recanted her allegation fully explaining how and why she fabricated the charges against the applicant. The applicant pursued post-conviction relief under article 11.07. After doing an analysis under *Ex parte Elizondo*, 947 S.W.2d 202 (Tex.Crim. App.1996), the convicting court recommended granting relief. We filed and set the case to determine whether the applicant's guilty plea precludes his actual innocence claim under *Elizondo*. We conclude that it does not.

## I.  Analysis

■ There are two types of actual innocence claims that may be raised in a collateral attack on a conviction. A bare innocence claim, or *Herrera*-type [1] claim "involves a substantive claim in which applicant asserts his bare claim of innocence based solely on newly discovered evidence." *Ex parte Franklin*, 72 S.W.3d 671, 675 (Tex.Crim.App.2002) (citing *Schlup v. Delo*, 513 U.S. 298, 314, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Elizondo*, 947 S.W.2d at 208). The other actual innocence claim, a *Schlup*-type claim, we explained "is a procedural claim in which applicant's claim of innocence does not provide a basis for relief, but is tied to a showing of constitutional error at trial." *Ibid.* (citing *Schlup*, 513 U.S. at 314, 115 S.Ct. 851).

■ In *Elizondo*, we held that a bare innocence claim is cognizable in an application for writ of habeas corpus. *Elizondo*, 947 S.W.2d at 205. Incarceration of an innocent person offends federal due process, therefore a bare innocence claim raises a constitutional challenge to the conviction. *Ibid.* But we also said that a

conviction should not be overturned lightly and that the burden on the applicant who has had error-free proceedings is exceedingly heavy to take into account society's and the State's interest in finality. *Elizondo*, 947 S.W.2d at 208. To be granted relief on a bare innocence claim, the applicant must show that the new evidence unquestionably establishes his innocence. *Id.* at 208–09. We interpreted this to mean that the applicant must prove by clear and convincing evidence that no reasonable juror would have convicted the applicant in light of the new evidence. *Id.* at 209. To determine whether a habeas applicant has reached this level of proof, the convicting court weighs the evidence of the applicant's guilt against the new evidence of innocence. *Id.* at 207.

We have never discussed what effect, if any, a guilty plea would have on this analysis. This is the question we turn to today.

There is nothing explicit in *Elizondo* or the cases on which it relies that prohibits or limits the analysis to jury or bench trials. *Elizondo* instructs the convicting court to "weigh the evidence in favor of the prisoner against the evidence of his guilt." *Ibid.*

In *Elizondo*, we said that our job was to "decide whether the newly discovered evidence would have convinced the jury of applicant's innocence." *Ibid.* That was in the context of that case, in which a jury had decided Elizondo's guilt. But we said a bare innocence claim is not an attack on the jury's verdict. *Id.* at 209. "What [the applicant] wants is a new trial based on newly discovered evidence which he claims proves his innocence." *Ibid.* The policy supporting our holding in *Elizondo*, that the punishment of an innocent person violates federal due process, is the same for an applicant regardless of whether his case

---

1.  *See Herrera v. Collins,* 506 U.S. 390, 113    S.Ct. 853, 122 L.Ed.2d 203 (1993).

was heard by a judge or jury or whether he pleaded guilty or not guilty. *See ibid.*

Convicting courts reviewing bare innocence claims should give great respect to the jury's verdict of guilt. Convicting courts should also give great respect to knowing, voluntary, and intelligent pleas of guilty. But we should not foreclose relief because a defendant pleaded guilty when the policy behind granting relief on a bare innocence claim is the same.

The legislature has enacted two statutes that contemplate a defendant's being able to seek relief on a claim of actual innocence after a guilty plea: Code of Criminal Procedure article 64.03(b), and Texas Civil Practices and Remedies Code section 103.001.

Newly-enacted Chapter 64 of the Code of Criminal Procedure sets out procedures for convicted defendants to obtain forensic DNA testing. Article 64.03(b) states that:

A convicted person who pleaded guilty or nolo contendere in the case may submit a motion under this chapter, and the convicting court is prohibited from finding that identity was not an issue in the case solely on the basis of that plea.

Tex.Code Crim. Proc. art. 64.03(b). Defendants who pleaded guilty or nolo contendere may obtain forensic DNA testing if they meet the requirements of Chapter 64.

Chapter 64 provides for forensic DNA testing but does not provide a vehicle for obtaining relief if testing reveals affirmative evidence of innocence. The vehicle for relief after obtaining test results that constitute affirmative evidence of innocence is article 11.07 for noncapital felonies and article 11.071 for capital murder. The legislature has not limited actual innocence claims based on forensic DNA testing to defendants who pleaded not guilty and went to trial. Neither should we.

Chapter 103 of the Civil Practices and Remedies Code sets out procedures to compensate persons wrongfully imprisoned. Section 103.001 names claimants who are eligible for compensation. Before 2001, the statute provided compensation only for claimants who had pleaded not guilty to the criminal charge that led to imprisonment. The legislature amended the statute, and it now states:

(a) A person is entitled to compensation if:

(1) the person has served in whole or in part a sentence in prison under the laws of this state;

(2) the person:

(A) has received a full pardon on the basis of innocence for the crime for which the person was sentenced; or

(B) has been granted relief on the basis of actual innocence of the crime for which the person was sentenced.

Tex. Civ. Prac. & Rem.Code § 103.001(a). Compensation is available under this provision for claimants who have been granted relief on the basis of an actual innocence claim, regardless of how the claimant pleaded to the charges.

The State makes three main arguments against our conclusion: (1) the applicant's plea is not subject to collateral review; (2) public policy is served by finality; and (3) granting relief to the applicant would encourage and reward perjury.

The State argues the applicant's plea is not subject to collateral review. Habeas corpus, it argues, is traditionally governed by equitable principles, and the applicant's conduct in this case may preclude his being entitled to relief. Here the State claims the guilty plea and judicial confession prevent collateral review. But we do not make the distinction between those

who have pleaded guilty and those who have pleaded not guilty for other claims of relief raised in habeas applications.

We address cognizable claims in habeas proceedings regardless of the plea in the case. We are unpersuaded that equitable principles should prevent an innocent person from obtaining the relief simply because he pleaded guilty. There is nothing equitable about permitting an innocent person to remain in prison when he produces new evidence that unquestionably shows that he did not commit the offense for which he is incarcerated.

■■ The purpose of criminal proceedings is to separate the guilty from the innocent. *Herrera*, 506 U.S. at 398, 113 S.Ct. 853 (citing *United States v. Nobles*, 422 U.S. 225, 230, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)). From time to time something goes awry in the process by which a defendant is convicted, for example, when a complainant makes false charges. The error occurs within the judicial system though it happened through no fault of the convicting court or the parties. It is appropriate for the judicial system to correct the error through habeas corpus.

The State says that a guilty plea waives any contention regarding the sufficiency of the evidence. This is true, but the State's assertion that a claim of actual innocence is nothing more than a challenge to the sufficiency of the evidence is not true.

■ An applicant claiming actual innocence is not claiming that the evidence at trial was insufficient to support the conviction. On the contrary, the successful applicant shows by clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence. The burden is on the applicant because we presume

that the conviction is valid. *See Elizondo*, 947 S.W.2d at 207.

Moreover, if an actual innocence claim were nothing more than a challenge to the sufficiency of the evidence, then no claim of actual innocence—whether the conviction was based on a jury trial, bench trial, or guilty plea—would be cognizable on a writ of habeas corpus. *Ex parte Easter*, 615 S.W.2d 719, 721 (Tex.Crim.App.1981) (attack on sufficiency of the evidence at trial may not be raised in habeas proceedings).

■ The State finds it significant that the applicant's trial resulted in a hung jury that never made a finding on the applicant's guilt. According to the State, the crux of the analysis in *Elizondo* and its progeny is if the new evidence is such that it undermines confidence in the jury's finding of guilt, then the jury's verdict was infirm. Were we to follow the State's argument to its natural conclusion, a defendant could raise a bare innocence claim only if guilt had been determined by a jury. But the policy supporting the relief granted in *Elizondo* was that federal due process is violated when an innocent person is incarcerated. *Elizondo*, 947 S.W.2d at 209. That policy applies with no less force when the conviction is obtained by a bench trial or guilty plea.

The existence of a trial record permitting an *Elizondo* analysis is not sufficient reason to ignore a guilty plea, according to the State. A convicting court is not free to ignore a guilty plea when reviewing a collateral attack. "Rather, the court charged with deciding such a claim should make a case-by-case determination about the reliability of the newly discovered evidence under the circumstances." *Id.* at 207 (quoting *Herrera*, 506 U.S. at 443, 113 S.Ct. at 883, 122 L.Ed.2d at 244 (Blackmun, J., dissenting)). The circumstances may include that an applicant pleaded guilty. A

reading of the extensive findings of the convicting court in this case shows that convicting courts are capable of fully considering the significance of a guilty plea and weighing that circumstance against the newly discovered evidence.

The State next argues that the applicant's argument rewards and encourages perjury. The applicant entered a false plea and compounded this with a false judicial confession. The State claims that allowing this applicant to obtain relief will encourage innocent defendants to plead guilty to get a lighter sentence and then collaterally attack the conviction when the sentence becomes too difficult to bear. This ignores the realities of pursuing a bare innocence claim under article 11.07. A defendant would have to assume that new evidence that affirmatively shows his innocence will appear from nowhere. If a habeas application amounts to a challenge to the sufficiency of the evidence, the applicant will not obtain the relief he seeks. *See e.g., Easter,* 615 S.W.2d at 721.

The guilty plea process is not perfect. But guilty pleas allow the parties to avoid the uncertainties of litigation. The decision to plead guilty, as we have seen in this case, may be influenced by factors that have nothing to do with the defendant's guilt. The inability to disprove the State's case, the inability to afford counsel, the inability to afford bail, family obligations, the need to return to work, and other considerations may influence a defendant's choice to plead guilty or go to trial.[2] Being aware of these considerations, we will not preclude actual innocence claims because the conviction was the result of a guilty plea.

Finally, the State argues that public policy is served by finality. We agree. Convictions based on knowing, intelligent, and voluntary pleas of guilty ought to be afforded the highest level of respect. As the Supreme Court quoted in *United States v. Timmreck:*

> Every inroad on the concept of finality undermines confidence in the integrity of our procedures; and, by increasing the volume of judicial work, inevitably delays and impairs the orderly administration of justice. The impact is greatest when new grounds for setting aside guilty pleas are approved because the vast majority of criminal convictions result from such pleas. Moreover, the concern that unfair procedures may have resulted in the conviction of an innocent defendant is only rarely raised by a petition to set aside a guilty plea.

*Timmreck,* 441 U.S. 780, 784, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979) (quoting *United States v. Smith,* 440 F.2d 521, 528–529 (7th Cir.1971) (Stevens, J., dissenting)). Though *Timmreck* was based on an interpretation of the federal rules, the underlying principle is the same in Texas. The Supreme Court noted that a federal rule violation "does not present 'exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent.'" The same is true in our habeas proceedings. Cognizable claims on habeas are limited to claims to "jurisdictional or fundamental defects and constitutional

---

2. Innocent people may plead guilty, for various reasons. An innocent person may want to take advantage of a discounted sentence in a plea bargain, rather than gamble on a far greater sentence if a mistaken verdict is returned. Or a person may not know what he is admitting and accept his attorney's advice that a guilty plea is prudent. Or a person may be under some pressure to accept responsibility for something he did not do, in order to protect someone else, whom he loves or fears.

*United States v. Timbana,* 222 F.3d 688, 718 (9th Cir.2000) (Kleinfeld, J., dissenting)

claims." *Ex parte Graves*, 70 S.W.3d 103, 109 (Tex.Crim.App.2002).

We are not dealing with a statutory or rule violation in this case; here, the applicant presents a valid claim of actual innocence based on evidence that was unavailable at the time he pleaded guilty.

In *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), the United States Supreme Court noted that a rule that made pleading guilty attractive to defendants because it allowed them to avoid the death penalty did not render the pleas involuntary when the Court later held that the statute was unconstitutional. *Id.* at 757, 90 S.Ct. 1463. The Court found it significant that nothing in the record indicated that the conviction was inaccurate or unreliable. *Ibid.*

In cases in which the Supreme Court has held there is no collateral review after a guilty plea, it has specifically noted the absence of findings that the plea was inaccurate or unreliable.

> This is not to say that guilty plea convictions hold no hazards for the innocent or that the methods of taking guilty pleas presently employed in this country are necessarily valid in all respects. This mode of conviction is no more foolproof than full trials to the court or to the jury. Accordingly, we take great precautions against unsound results, and we should continue to do so, whether conviction is by plea or by trial.... But our view is to the contrary and is based on our expectations that courts will satisfy themselves that pleas of guilty are voluntarily and intelligently made by competent defendants with adequate advice of counsel and that there is nothing to question the accuracy and reliability of the defendants' admissions that they committed the crimes with which they are charged. In the case before us, nothing in the record impeaches Brady's

plea or suggests that his admissions in open court were anything but the truth. *Brady*, 397 U.S. at 757–58, 90 S.Ct. 1463. If we have reason to think that an applicant's plea was accurate and reliable, we would conclude that the claim would not support relief for actual innocence. But when a habeas record supports a finding that new evidence unquestionably established an applicant's innocence, it is difficult to conclude that a prior guilty plea was accurate or reliable. The holdings in *Brady* and *Timmreck* do not require that we ignore clear and convincing evidence of actual innocence.

The State also cites *Schlup v. Delo*, 513 U.S. 298, 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), for the proposition that the interest in releasing innocent defendants does not extend to prisoners whose guilt is conceded or plain. The case cited for this proposition in *Schlup* discussed finality in relation to claims of error at trial, not actual innocence claims, which the Court explicitly permits in *Schlup*. *See Kuhlmann v. Wilson*, 477 U.S. 436, 452, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). And though an applicant concedes his guilt by pleading guilty, when new evidence unquestionably established innocence, a conclusion that the applicant was guilty of the offense is anything but plain.

The State claims that allowing this applicant to obtain relief would allow any applicant to seek relief if he can show actual innocence and an excuse for the guilty plea. As the cases the State cites show, claims of actual innocence are rare and the cases in which relief is granted are even more rare. *See Schlup*, 513 U.S. at 321 n. 36, 115 S.Ct. 851 (and cases cited therein). We are confident that the convicting courts of Texas can tell the difference between a meritorious claim of actual innocence accompanied by compelling new evidence and a bogus claim accompanied

by bare allegations of innocence. Applicants may file applications, but it does not mean that convicting courts will recommend granting relief.

We also do not think that the convicting courts will be flooded with countless applications. Applicants have been permitted to file bare innocence claims in the courts of this State since *Elizondo* was handed down six years ago. The flood of applications has not materialized. Nor have we seen evidence that *Elizondo's* holding encouraged inmates or their friends and family to harass victims of crimes to encourage them to recant. Since *Elizondo* was handed down, in a few cases when applicants have presented credible and compelling new evidence of innocence that met the *Elizondo* standard, innocent people have been released from punishment. The criminal justice system has done justice.

## II. Application

■ We now review the convicting court's recommendation to grant relief. The facts according to the habeas record show that the applicant was tried on the charge of aggravated sexual assault in July 1997. The jury conveyed that it was hopelessly deadlocked. Ten jurors had voted to acquit, and two to convict the applicant. The applicant pleaded guilty to the charge before the trial court could declare a mistrial.

The convicting court accepted the guilty plea and deferred adjudication, placing the applicant on community supervision for ten years. More than two years later, the convicting court revoked the applicant's community supervision and sentenced him to the remainder of his ten-year term in the institutional division of the Texas Department of Criminal Justice.

Approximately two years later, the applicant filed this application for writ of habeas corpus under article 11.07. The applicant alleged that he learned that the complainant in his case had consistently recanted her allegations since before his trial. To support the recantation, the applicant submitted affidavits from the complainant, from the complainant's best friend at the time the allegations were made, A.S., and the complainant's boyfriend at the time the allegations were made, B.G.

The applicant gave several reasons for pleading guilty to the offense. He was unable to make bail and keep his retained counsel for the first trial. The applicant was unable to afford to continue with retained counsel for a second trial. The applicant had already spent ten months in jail awaiting his first trial and would have had to continue his incarceration during a second trial. The applicant was addicted to drugs at the time he entered his plea.

The convicting judge explained in her findings that her recollection of the trial and plea proceedings support the applicant's claim that his guilty plea was not accurate. The judge remembered being surprised that the applicant pleaded guilty especially in light of the evidence that had been presented during the trial that resulted in a hung jury. After going through the plea proceedings, the judge assumed that there were facts affecting the applicant's decision to plead guilty of which she was unaware.

Taking into consideration the reasons given by the applicant for pleading guilty and her own recollection of the trial and plea proceedings, the convicting judge found the reasons given by the applicant in the habeas proceedings were more credible than the assertions made to the court at the time of the plea.

The convicting judge next considered the new evidence that affirmatively showed the applicant's innocence. The ap-

plicant's newly discovered evidence includes affidavits and testimony that the complainant recanted her allegations almost immediately after making the allegation and that during the time between the allegation and the trial, the complainant consistently—to her friends—denied the truth of the allegation. This is corroborated by affidavits from A.S. and B.G.

In her affidavit and testimony at the habeas evidentiary hearing, A.S. explained that two to three days after the complainant made her allegations, the complainant told her that the allegations were not true. Before trial, the complainant confided to A.S. that she was worried that her testimony would not be believed. After testifying, the complainant told A.S. that she thought her testimony had gone well and that she thought she had been convincing.

B.G.'s affidavit notes that he heard about the allegations from the complainant's mother. He said that when he talked to the complainant about the allegations, she told him that they were not true and that she fabricated the charges because she hated the applicant and wanted him to leave. As the trial approached, B.G. tried to convince the complainant that she should stop lying about the charges. The complainant became angry with B.G. and accused him of being disloyal.

In the complainant's affidavits, she explains why she fabricated the charge against the applicant. She explained that the applicant's abuse of her mother, the drug use by the applicant and her mother, her mother's claims that the applicant was unfaithful, and personal disagreements between herself and the applicant, among other reasons led her to fabricate the charges. Her explanations about whom she told about the fabrication and when are consistent with the affidavits of A.S. and B.G.

According to her affidavit, the complainant did not plan the fabrication. Her mother asked her whether the applicant has ever done anything to her. She told her mother that the applicant had sexually assaulted her. At the trial, she explained, she wove the allegations of sexual assault into events that had actually occurred. She said she pretended to cry when she found out the applicant received community supervision. She decided to recant officially several months after she received letters from B.G. explaining that the applicant had gone to prison.

The convicting court recalled the trial, due to "the exceptional nature of the testimony adduced before it during the trial." The court explained, "Rife with material contradictions, this Court observed instance upon instance of testimony that either conflicted with testimony given by other State's witnesses or which was simply implausible." The court gave examples of inconsistent and implausible testimony.

In one example, the complainant testified that she had described in her diary, which she kept at her home, some of the events that formed the accusation against the applicant. Defense counsel requested that the complainant produce the diary, and the convicting court ordered her to do so the following day. The complainant and her mother came to court the next day without the diary stating that their home had been burglarized the night before and that the only thing taken was the diary.

In another instance, there was conflicting testimony about a blood-stained shirt said to have been found by the complainant's aunt. The complainant testified that she had left the shirt at the scene of an attack in Oklahoma. The complainant's aunt testified that she found the shirt under the complainant's bed in Dallas. She also testified that she offered the shirt to

an investigator who said he could not accept it.

Also, the doctor who examined the complainant explained that she was unwilling to express a definitive opinion about her findings, but she said there were "[n]o physical findings suggestive of abuse at this time."

The convicting court, after weighing the evidence from the trial, the applicant's guilty plea, the applicant's stated reasons for pleading guilty, and the newly discovered evidence found "the evidence of Applicant's guilt is so far outweighed by the evidence of Applicant's innocence as to be entirely one-sided." Having so found, the convicting court concluded that the new evidence unquestionably established the applicant's actual innocence of the aggravated sexual assault of the complainant. The court recommended granting the relief sought by the applicant.

The record supports a finding that the recantation in this case is more credible than the testimony at trial. The affidavits of the complainant, B.G., and A.S. and the testimony of A.S. at the habeas hearing contradict the complainant's testimony at trial and constitute affirmative evidence of the applicant's innocence. We are convinced by clear and convincing evidence that no rational jury would convict the applicant in light of the new evidence. Relief is granted.

The Director of the Texas Department of Criminal Justice, Institutional Division is ordered to return the applicant to the custody of the convicting court so that he may answer the charges against him.

WOMACK, J., dissented.

HERVEY, J., filed a dissenting opinion, in which KELLER, P.J., and KEASLER, J., joined, and in Part II of which WOMACK, J., joined.

HERVEY, J., filed a dissenting opinion in which KELLER, P.J., and KEASLER, J., joined.

I respectfully dissent. Having failed to establish any error (constitutional or otherwise) in connection with his original guilty plea and conviction at which time he was afforded the awesome constitutional protections guaranteed to those accused of crimes, applicant bears an extremely heavy burden of establishing his right to habeas corpus relief five years after he voluntarily confessed his guilt. I would hold that applicant has not met this burden.

## I. Court's Holding Is Unnecessarily Broad

Applicant presents a free-standing claim of actual innocence under our decision in *Ex parte Elizondo,* 947 S.W.2d 202, 206–09 (Tex.Cr.App.1996). In *Elizondo,* we explained **our** task in evaluating actual innocence claims:

> Because, in evaluating a habeas claim that newly discovered or available evidence proves the applicant to be innocent of the crime for which he was convicted, our task is to assess the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole, **we** must necessarily weigh such exculpatory evidence against the evidence of guilt adduced at trial.

*See Elizondo,* 947 S.W.2d at 206 (emphasis supplied). We reaffirmed this very standard in our more recent decision in *Ex parte Franklin,* 72 S.W.3d 671, 677 (Tex. Cr.App.2002).

Applicant contends that newly discovered evidence establishes his innocence, so he should be allowed to take back his admission of guilt. The State argues, among other things, that allowing applicant to do this would disrupt the adminis-

tration of justice in future habeas corpus cases by encouraging guilty-pleading defendants to collaterally attack their pleas "so long as [they] can provide some evidence to show that [they are] actually innocent and provide an excuse for having pled guilty." The State claims that, since many convictions result from guilty pleas, this could clog the courts with meritless actual innocence claims from guilty-pleading defendants. The State also claims that *Elizondo* cannot even apply to guilty-pleading defendants because it would be impossible to fulfill *Elizondo's* requirement to weigh an applicant's newly discovered evidence "against the evidence of guilt adduced at trial" since there was no trial. *See Elizondo*, 947 S.W.2d at 206.

Applicant responds that this Court can grant habeas corpus relief to him in an opinion limited to the "exceptional set of circumstances" presented by this case. The "exceptional set of circumstances" to which applicant refers is the existence of a record from applicant's 1997 trial that resulted in a hung jury. Applicant asserts that this distinguishes his case from most other cases involving convictions from guilty pleas. Applicant asserts:

At the outset, counsel for Applicant will acknowledge that he admittedly seeks to confine the parameters of this Court's inquiry to the unique circumstances of the instant case. The reason for Counsel's desire to do so is simple—for if the Court's inquiry is put *generally* (i.e., Can *a* habeas applicant who has pled guilty and waived a jury still avail himself of the relief afforded under *Elizondo?* ), the answer to the inquiry must always be "No." The reason for this answer is most readily apparent from the above cited portions of *Franklin* and *Elizondo*. Simply put, the habeas court's "weighing" of the newly discovered exculpatory evidence *against* the evidence of guilt adduced at trial is at the

very heart of the *Elizondo* analysis. Absent a record with which to conduct this weighing of exculpatory evidence against the evidence of guilt, a habeas applicant simply *cannot* provide the very *substance* which is at the heart of the *Elizondo* inquiry. Thus, as Applicant previously asserted, it is certain that had there existed only Applicant's plea colloquy in the instant case, Applicant would not now be before this Court.

\* \* \* \* \* \*

Applicant recognizes the concerns that the Court might have regarding the ramifications of granting Applicant's writ on both this court's past and *future* habeas jurisprudence. If this writ is granted, will Texas' court's (sic) face the specter of endless writs on grounds of actual innocence from those defendants who chose to enter guilty pleas? The answer to this is *necessarily* "No." By its very nature, the instant case presents what can only be characterized as the *most exceptional* set of circumstances— namely, the existence of a full **trial** transcript in conjunction with a guilty plea. As Applicant has detailed previously, **Applicant's writ, and the process through which the habeas court analyzed it prior to making its recommendation, simply does not deviate from the standard articulated in *Elizondo*.** Thus, Applicant's case, as an anomaly, will hold little if any precedential value upon which to support a claim that relief under *Elizondo* may be maintained on a *guilty plea alone.*

(Emphasis in Original).

Both parties, therefore, agree that a broad decision, such as the one the Court makes here, that apparently permits a habeas corpus applicant to raise an *Elizondo* claim "on a guilty plea alone" could adversely impact the administration of jus-

tice in future habeas cases. The Court can and should dispose of this particular case by exercising restraint and limiting its decision to the "exceptional set of circumstances" presented by this case "namely, the existence of a full trial transcript in conjunction with [applicant's] guilty plea."

## II. Applicant's Remedy Is Executive Clemency

I would decide, however, that *Elizondo* should not be extended to an applicant whose conviction rests on a legally valid and voluntary guilty plea that years later the applicant claims was a lie and wants to take back. In evaluating applicant's claim of actual innocence, we have to recognize that applicant freely and voluntarily confessed his guilt to the offense of aggravated sexual assault. The habeas court and the parties also recognize that applicant's voluntary admission of guilt presents a significant obstacle to obtaining habeas corpus relief and disregarding society's valid finality concerns. *See United States v. Timmreck,* 441 U.S. 780, 99 S.Ct. 2085, 2087–88, 60 L.Ed.2d 634 (1979). Applicant claims, however, that it should make no difference whether he "arrived in prison through his own false guilty plea" because the "overriding remedial goal" of the judiciary should now be to release this self-admitted perjurer from prison.

By its very terms, however, *Elizondo* is limited to cases where an applicant has pled not guilty and is convicted after a trial. *Elizondo* was an extremely controversial decision and it is still subject to reasonable debate whether an applicant, who pleads not guilty, should be permitted to raise a free-standing claim of actual innocence on habeas corpus. *See Franklin,* 72 S.W.3d at 678–79 (Womack, J., concurring); *Elizondo,* 947 S.W.2d at 215–16 (Womack, J., dissenting) (*Elizondo's* "revolutionary and unwarranted proce-

dure" rests on "mighty thin sand"); *cf. Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 859–62, 122 L.Ed.2d 203 (1993) (freestanding claims of actual innocence "have never been held to state a ground for federal habeas corpus relief" in part because "there is no guarantee that the guilt or innocence determination would be any more exact" on habeas corpus than it was at trial).

An applicant who pleads guilty stands on a different plain. A legally valid guilty plea is a significant event in the criminal process. *See McGlothlin v. State,* 896 S.W.2d 183, 190 (Tex.Cr.App.) (Meyers, J., dissenting), cert. denied, 516 U.S. 882, 116 S.Ct. 219, 133 L.Ed.2d 150 (1995). It "is an admission of factual guilt so reliable that, where voluntary and intelligent, it *quite validly* removes the issue of factual guilt from the case." *Menna v. New York,* 423 U.S. 61, 96 S.Ct. 241, 242 n. 2, 46 L.Ed.2d 195 (1975) (emphasis in original); *see generally, Tollett v. Henderson,* 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973); *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Parker v. North Carolina,* 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970); *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

Important reasons exist for treating an applicant, who claims to have falsely pled guilty, differently from an applicant who pleads not guilty and then is convicted after a trial. The applicant in this case admits to having made what he characterizes as a "false guilty plea" for which he received a bargained-for benefit of deferred adjudication. Applicant accepted the benefits of this bargain and later violated the law resulting in an adjudication of his guilt for the aggravated sexual assault offense. Applicant now claims that he is innocent and he wishes to take back his "false guilty plea."

This conduct compromises the integrity of the judicial process. Notwithstanding applicant's reasons for making what he claims was the difficult decision to falsely plead guilty, the fact remains that, if applicant is now to be believed, he still committed perjury by falsely pleading guilty. *See Leday v. State,* 983 S.W.2d 713, 732 (Tex. Cr.App.1998) (McCormick, P.J., dissenting) (Constitution does not guarantee us the freedom from making difficult choices). Under these circumstances, I would hold that applicant has exhausted his remedies through the judicial process and that his remedy is to seek executive clemency. *See* Texas Administrative Code, Title 37, Section 143.2 (West 2002) (procedures for obtaining pardons for innocence); *cf. Herrera,* 113 S.Ct. at 866–69 (executive clemency "is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted").

## III. Applicant Not Entitled To Habeas Corpus Relief Under *Elizondo*

Applicant asserts that even though he has compromised the judicial process with his false guilty plea, the judicial process would be even more compromised by the continued incarceration of an innocent person. Applicant claims that he has "unquestionably establish[ed]" his innocence under *Elizondo. See Elizondo,* 947 S.W.2d at 209.

### A. Insufficient Record

The habeas record does not include the reporter's record from applicant's 1997 trial even though it appears from our review of the habeas court's findings that the habeas court reviewed that record in making its recommendations to this Court. Without an adequate record this Court is prevented from weighing applicant's exculpatory evidence against the evidence of guilt adduced at trial which applicant ac-

knowledges "is at the very heart of the *Elizondo* analysis." *See Franklin,* 72 S.W.3d at 677; *Elizondo,* 947 S.W.2d at 206.

### B. Record Before Court Does Not "Unquestionably Establish" Innocence

In *Elizondo,* we held that a habeas corpus applicant has the burden to "unquestionably establish" factual innocence. *See Elizondo,* 947 S.W.2d at 209. At this point in the judicial process, it is not enough for an applicant to raise some doubt (or even a reasonable doubt) about his guilt. *See id.* (an exceedingly high standard applies to the assessment of actual innocence claims on habeas corpus). Applicant's "new" evidence of innocence essentially boils down to the affidavits (attached to applicant's habeas corpus application) of three witnesses who, after remaining silent with information of applicant's "innocence" for five years, have now come forward to say that the complainant falsely accused applicant of raping her.

Applicant was the boyfriend of the complainant's mother. The complainant asserts in an affidavit that "everything [she] testified to [at applicant's 1997] trial was false." The complainant also asserts in the affidavit that in 1996 she made an outcry statement to her mother accusing applicant of raping her. The complainant also asserts in the affidavit that she falsely accused applicant of raping her because applicant was physically abusive to her mother and it "seemed like a good way to get [applicant] out of [their] house."

Yet we have no evidence from the complainant's mother confirming the complainant's stated motive (applicant's abuse of the mother) for falsely accusing applicant of raping her. It also is significant that the complainant's 1996 outcry statement to her mother was not overcome. This 1996

unrecanted outcry statement presumably was admitted at applicant's 1997 trial, and the Legislature has determined that such an outcry statement is reliable evidence of guilt. *See* Article 38.072, Texas Code of Criminal Procedure. Also, as with any recanting witness, it is impossible to know with any certainty which of the complainant's statements are true. *See Elizondo,* 947 S.W.2d at 216 n. 1 (Womack, J., dissenting) (pointing out the weakness of the testimony of a recanting witness whose testimony is always the "last time I was on the witness stand I didn't tell the truth").

The complainant's former boyfriend also filed an affidavit in which he asserts that the complainant told him in 1996 that she had falsely accused applicant. The former boyfriend also asserts in the affidavit that he conveyed this information to applicant's retained lawyer during applicant's 1997 trial but that "for some reason" applicant's lawyer did not ask him about it when the former boyfriend testified at applicant's 1997 trial. This portion of the former boyfriend's affidavit asserts:

> I attended [applicant's] trial, and continued to try and talk [the complainant] out of going ahead with it. After sitting through some of the trial though, I decided that I should say something. During one of the breaks, I told [applicant's] attorney what [the complainant] had told me. The attorney told me that he wanted me to testify, and that he would see if I still could. [Applicant's] attorney put me on the stand, but for some reason he never asked me about what [the complainant] had told me.

Applicant, however, has not produced any evidence from applicant's trial counsel corroborating any of this or explaining why trial counsel declined to pursue a line of questioning at applicant's 1997 trial that would have established applicant's innocence.[1] Moreover, since the habeas record is silent on whether applicant's trial counsel conveyed this information to applicant, we cannot know whether applicant's evidence of "innocence" is "new."

While applicant's "new" evidence arguably raises some doubt about applicant's guilt, it does not "unquestionably establish" his innocence. *See Elizondo,* 947 S.W.2d at 209. Applicant, therefore, is not entitled to habeas corpus relief.

I respectfully dissent.

WOMACK, J., joined Part II.

PRICE, J., filed this opinion concurring in the denial of the State's Motion for Rehearing, in which COCHRAN, J., joined.

I agree with the majority's conclusion that the applicant has unquestionably proven his innocence in compliance with *Ex parte Elizondo,* and is entitled to the relief sought. I write separately to respond to arguments made against this conclusion.

First, there is a procedural matter; the Court should not dismiss the application. The fact that the applicant was released on bond after this Court issued an opinion granting relief and pending the State's Motion for Rehearing does not change the applicant's status at the time the application was filed or when relief was granted. At the time this Court granted relief, the applicant was in custody. The time of filing and the time when relief is granted, are the relevant moments in time for purposes of considering whether an applicant is un-

---

**1.** The habeas record reflects that applicant also raised an ineffective assistance of counsel claim. According to the habeas court's findings, however, trial counsel's failure to question the former boyfriend on the subject of applicant's innocence was not urged as a basis for applicant's ineffective assistance of counsel claim.

der restraint for the purposes of a writ application filed under Article 11.07.

## I.  Independent Examination of the Record

The State argues that we are required to conduct an independent examination of the 1997 trial record because *Elizondo* requires it. First, this argument comes too late in a motion for rehearing after written opinion. If there were items that the State wanted this Court to review, it could have requested the convicting court to include them in the record, and if the convicting court denied its request, the State could have requested that we order the record from that court. The State seems to be repeating arguments made by the dissent on original submission. These arguments were considered, but rejected, by the majority. Nothing new is raised.

By way of explanation for its failure to request that the record be forwarded or to make any arguments disagreeing with the trial court's findings on original submission, the State says that we specifically asked the parties to address what effect the applicant's guilty plea had on his actual innocence claim. As a result, the State did not include arguments about the record. But any habeas practitioner should know that the Court of Criminal Appeals *is* the habeas court. Any application filed pursuant to Texas Code of Criminal Procedure Article 11.07 is returnable to this Court. We do not hold hearings and take testimony; the convicting court performs these functions and makes findings of fact and conclusions of law. The proceedings in this Court are not merely an appeal from the convicting court. And the litigants who practice before this Court rarely get to redo their arguments. After answering the legal question presented for review, our next step is to review the trial court's recommendation.

The place to respond to the applicant's factual allegations and legal claims was in the convicting court, which the State did. Besides a general denial, the State had little to say in response to the application. The State said, "While the evidence provided by Applicant certainly raises the possibility that Applicant may be innocent, the State is troubled by the fact that Applicant chose to plead guilty and signed a judicial confession admitting to sexually assaulting [the complainant] when she was twelve years old."

I disagree that this Court's failure to review the trial record from on original submission was incorrect. We have repeatedly held that although this Court has the ultimate power to decide matters of fact in habeas corpus proceedings, generally if the trial court's findings of fact are supported by the habeas record, they should be accepted by this Court. *See Ex parte Brandley,* 781 S.W.2d 886, 892 (Tex. Crim.App.1989); *Ex parte Adams,* 768 S.W.2d 281, 288 (Tex.Crim.App.1989). In habeas cases, it is the habeas record that controls, although the trial record may be relevant to the habeas judge. No legitimate policy reason has been presented to persuade me that we should treat *Elizondo* claims differently.

The State has not identified any findings that it claims are erroneous, and during oral argument, the State repeatedly said that it did not contest the findings of the trial court and that the facts of this case are compelling.

As for the State's suggestion that the Court was cutting corners in its opinion on original submission, the better course for parties filing a motion for rehearing is to stick to persuasive arguments on the merits. Parties may disagree with the result in a certain case; they should do so respectfully, however.

## II. Newly Discovered Evidence

The suggestion has also been made that the evidence presented along with the application is not newly discovered. The State claims in its motion for rehearing that it is not clear whether the evidence is new. It is important to note that, once again, this argument was not raised by the State on original submission. The State has had ample opportunity to make this argument in the convicting court and in this Court.[1]

Even on the merits the State must lose, however. The fact that there was some evidence at the time of the applicant's trial that could have been used to impeach the complainant, does not mean that her affidavit recanting her trial testimony is not new evidence that affirmatively demonstrates the applicant's innocence.

There was some evidence available at the time of trial that indicated that the complainant lied about her allegations. The complainant herself explained that she told her boyfriend that she had lied about the allegations. Also, the boyfriend testified outside the presence of the jury that the complainant told him that she had lied about the allegations. This evidence attacked the complainant's credibility; it was not affirmative evidence of innocence.

Now the applicant presents the complainant's affidavit that no sexual assault ever occurred. This is affirmative evidence of innocence. And, it is supported by the boyfriend's affidavit and the affidavit and testimony of the complainant's best friend. This is new evidence of innocence.

The suggestion to the contrary is not persuasive.

## III. Evidence that Unquestionably Established the Applicant's Innocence

Contrary to the State's assertion, this Court considered and weighed the applicant's guilty plea, not just in addressing the question of law presented, but also in determining whether the applicant had produced evidence that unquestionably established his innocence. *Tuley*, No. 74,-364, slip op. at 13–14, 17 (Tex.Crim.App. Dec. 18, 2002).

I am troubled by the use of the term "perjurious guilty plea." It is true that the applicant's claim today contradicts his judicial confession and guilty plea. It is also true, however, that the complainant's testimony at trial contradicts the affidavit that was submitted along with the application. To the extent that the applicant's plea was false, the complainant's testimony was also. This characterization adds little to the discussion of the issues in this case.

The State contends that even though the complainant in this case has now sworn under oath that applicant did not commit any offense, applicant is not entitled to relief from his aggravated sexual assault conviction because he purportedly committed perjury in pleading guilty. Apparently the logic is: he may not be guilty of aggravated sexual assault, but he is guilty of perjury, so keep him in prison for aggravated sexual assault. This is curious logic. Normally our criminal justice system at-

---

1. The applicant notes in his response to the State's motion:

   Though Applicant's writ application has been on file for approximately eighteen (18) months, the State has *never* made so much as a single mention even hinting that Applicant's evidence was not newly discovered. Thus, though the State filed an answer to Applicant's writ application, it appeared before the District Court at the evidentiary hearing, filed a brief in this Court, and argued before this Court, it has waited until its Motion for Rehearing to urge this point. Of perhaps greater significance though is the fact that the State assisted the trial court in preparing its Findings.

tempts to punish people for the specific crimes that they have committed. But here, instead of the maxim "make the punishment fit the crime," the argument is that we should "make the crime fit the punishment that has already been assessed." A person who has committed perjury may be convicted for perjury, but he should not be convicted of aggravated sexual assault because he committed perjury.

Moreover, I think it is colossal hypocrisy to exclaim, "we are shocked, positively shocked," that a person who has pleaded guilty pursuant to a negotiated plea bargain would never do so unless he were truly guilty and believed himself guilty. Who are we kidding? It is true that Mr. Tuley did sign and swear to a form stipulation that "the following facts [tracking the indictment allegations] are true and correct and constitute the evidence in this case." He, of course, did not design the form. It is certainly accurate to say that there was some evidence already admitted in the original trial that would support a finding that the indictment allegations were true.

It is also true that the trial judge asked the magic question: "Are you pleading guilty because you are in fact guilty and for no other reason?" and applicant responded: "Yes, ma'am." Does this make him a perjurer? A self-admitted liar?

Suppose Mr. Tuley had been given a dose of truth serum. Now, in response to the magic question, he responds:

Your Honor, I do not believe that I am guilty. In fact, I know that I am not guilty. However, the present jury is deadlocked. Some of those jurors may believe that I am not guilty, but others obviously differ. A different jury could conceivably find me guilty and sentence me to life in prison. That is a very serious risk to me. Furthermore, I do not have enough money to pay my lawyer for conducting a second trial. I am worried that I might have to go to jail just to be entitled to an appointed lawyer for a second trial. I have a job. I would lose my job if I had to go to jail for months waiting for a second trial. Quite frankly, I am out of money and out of time. I just want to go home. The State has made a very attractive offer of ten years deferred adjudication. This is an offer I cannot refuse, given the obvious risks I face if I continue to maintain my innocence and insist upon a second trial. So, even though I am innocent of this charge, I want to plead guilty because I am making a fully informed, free, voluntary and rational choice among the alternative courses of action available to me.

The trial judge, hearing this unusual response, is likely to say something along the lines of:

How can you expect me to accept your plea of guilty? This is a very serious offense and it carries a potential life sentence if you should violate the terms of your community service. How can you expect me to accept a guilty plea to the first degree offense of aggravated sexual assault of a child if you say you are not guilty, but you want to plead guilty anyway? And besides, I heard the same evidence that the jury heard and I am not fully persuaded that the evidence is sufficient to support a conviction beyond a reasonable doubt. I refuse to accept your guilty plea and we will set this case for another trial.

Mr. Tuley, then, is likely to say:

Judge, whose side are you on? Are you on my side? I just want to plead guilty. I didn't do it. I know that, but I also know that the prosecution has a child complainant who says that I did. I have a drug problem and a jury is likely to

hold that against me, and, frankly, I look dishonest. Nobody is going to believe me. Now, do me a favor and let me plead guilty and get my ten years deferred. This is a good deal. I want to take it. Don't stand in my way.

But an honorable trial judge might reasonably respond:

But, if you're not guilty, I cannot take your guilty plea. I am worried about this man pleading guilty to something he is not guilty of. That is just wrong, and I can't allow that kind of an injustice to take place in my court.

Mr. Tuley's honest reaction might well be: "Don't be my friend. With friends like you, who needs enemies?" Instead, Mr. Tuley's lawyer would probably yank him off to the corner and after a certain whispering back and forth, Mr. Tuley will see the light He will now respond appropriately to the magic question: "Are you pleading guilty because you are guilty and for no other reason?" with the right answer: "Yes, ma'am."

Our system encourages plea bargains that are freely, intelligently, and voluntarily made. *See North Carolina v. Alford,* 400 U.S. 25, 31–32, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). Over 90% of all criminal convictions are obtained through plea bargains. Surely we are not so naive as to believe that each and every one of these defendants is pleading guilty simply because he knows in his heart that he is guilty as sin and he wants to throw himself on the court's mercy, divinely oblivious to any punishment that he might receive. We long ago recognized that the single most important reason that a defendant pleads guilty is because he has an advantageous plea bargain with the State which he believes minimizes his risks. *See Cruz v. State,* 530 S.W.2d 817, 821–22 (Tex.Crim. App.1975) (noting that defendants "commonly deny during an Art. 26.13 . . . inqui-ry that any promises have been made that induced a plea of guilty, when in fact the prosecutor has promised to recommend a certain sentence in exchange for the plea. The deceptive denial stems from the fear that the trial court will not accept the plea if the question is answered truthfully"). Were this not so, the Legislature would not have enacted a statute that explicitly permits a defendant charged with a felony to withdraw his guilty plea if the trial judge refuses to follow the plea agreement. *See* Tex.Code Crim. Proc. art. 26.13. If a defendant were pleading guilty solely because he is guilty and for no other reason, any plea bargain would be irrelevant to his decision, and thus it would be irrelevant that the trial judge refuses to follow it.

Our criminal justice system is amply protected by requiring that a guilty plea be freely, intelligently, and voluntarily entered and that there exist some evidence to support that plea. *Alford,* 400 U.S. at 31, 91 S.Ct. 160. "An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." *Id.* at 37, 91 S.Ct. 160 . Neither logic nor law support a conclusion that, as a matter of law, a defendant who pleads guilty ipso facto commits perjury if he later asserts that he is, in fact, actually innocent and proves his innocence. This is especially important when, as here, the purported victim of the offense later testifies that, in truth, the defendant did not commit any offense at all. Our criminal justice system seeks to do justice. It is not justice to deny a guilty-plea-ing defendant any relief when his accuser later swears that the defendant is innocent and the trial judge believes that recantation is credible and consistent with the other evidence.

I am also troubled by the suggestion that the applicant's family might have been involved in putting pressure on the complainant to recant her allegations. In the absence of proof, and in a country where the principle that one is innocent until proven guilty is still the law of the land, unsupported speculations are inappropriate.

It surprises me that some still question whether the applicant has produced evidence that unquestionably establishes his innocence. Even without the recantation by the complainant, the State's case did not convince many. The convicting court was not persuaded by the State's evidence of guilt. Whatever spin is placed on the cold record today, the fact remains that the trial judge who heard the evidence at the trial and reviewed the evidence in the habeas proceedings concluded that the applicant had unquestionably established his innocence. Also, it is not as if the case at the trial was close. Ten of twelve jurors voted to acquit the applicant, even without the complainant's sworn recantation. This is compelling evidence that no reasonable jury hearing this new evidence would convict.

The evidence that is claimed to be the most damning is (1) the fact that the intimate relations between the applicant and the complainant's mother stopped at the same time the complainant alleged that the applicant began sexually assaulting her; and (2) the fact that the complainant testified that she did not have time to fabricate the details of her story because she did not plan to accuse the applicant until her mother asked her whether he had abused her.

First, there are plenty of reasons why intimate relations between two consenting adults may change or stop altogether. There are some suggestions in the record about why this may have occurred. The complainant's mother testified that the applicant was seeing other women during their relationship. Now that the complainant says that the applicant never sexually assaulted her, any persuasive force this might have had before no longer exists.

Second, there are large discrepancies in the record about how long the complainant, her mother, and aunt were together before the police arrived to interview the complainant.

To me, the most compelling evidence in this case is that the two people who really know what happened have agreed that it did not happen and that there is no independent affirmative evidence that a criminal offense even occurred. The trial judge who observed the trial found that the applicant produced new evidence that unquestionably proves his innocence. Nothing in the record contradicts those findings.

This case is not so much about what the applicant said, as it is about the trial judge's findings. The honorable, qualified, and experienced trial judge who presided over the applicant's trial and who reviewed the evidence presented in support of the application, after weighing all the evidence, found that the new evidence unquestionably established the applicant's innocence. These findings are supported by the habeas record, the record about which we are concerned in this case and all *Elizondo* cases. This case is a classic example of why we defer to the trial court's findings of fact in habeas cases.

As the Court said on original submission, "We are confident that the convicting courts of Texas can tell the difference between a meritorious claim of actual innocence accompanied by compelling new evidence and a bogus claim accompanied by bare allegations of innocence. Applicants may file applications, it does not mean that

convicting courts will recommend granting relief." *Tuley,* No. 74,364, slip op. at 12. I still have faith in the trial judges of Texas and their ability to discern the difference between meritorious claims and bogus ones.

With these comments, I join the majority of the Court in denying the State's Motion for Rehearing.

KELLER, P.J., filed a dissenting opinion.

The questions in this case are: (1) on original submission of this case, did this Court follow *Elizondo,*[1] and (2) should applicant get relief under *Elizondo?*

The answer to the first question is "no." *Elizondo* is the law, or at least it was until this case. *Elizondo* provides the framework for evaluating actual innocence claims on habeas. On original submission, the Court plainly did not follow *Elizondo.* *Elizondo* requires *this* Court to weigh the exculpatory evidence against the evidence of guilt adduced at trial, in order to determine if the record supports the habeas court's recommendation.[2] That is what this Court did in *Elizondo* itself, and has done since then in *Ex parte Franklin,*[3] in which, incidentally, we denied relief after the habeas court recommended that relief be granted. The Court's infelicitous desertion of the *Elizondo* standard in order to grant applicant relief is both inexplicable and unnecessary.

A disturbing aspect of the concurring opinion on rehearing, further signalling the abandonment of *Elizondo,* is its statement that the trial record is unnecessary to a determination of actual innocence claims. The conclusion that no "policy" reason exists to treat *Elizondo* claims "differently"

flatly contravenes the language of that case, which requires that, in evaluating actual innocence claims (as opposed to other kinds of habeas claims), the trial record be consulted. Contrary to statements in the concurring opinion on rehearing, the burden is always on the habeas petitioner to produce a record sufficient to support his claim. Petitioner did not do so on original submission, and so his application should have been denied. The concurring opinion blames the State for the failure to request that the record be forwarded to this Court. This is an unfounded shifting of the burden on habeas, and violates not only *Elizondo,* but also traditional habeas corpus principles.

But the record is now before us, and we can now weigh the exculpatory evidence against the evidence at trial in order to determine if the record supports the habeas court's recommendation. Unlike the other dissenting opinion on rehearing, I think that applicant's evidence qualifies as "newly discovered." Moreover, credibility decisions are up to the fact-finder, and in this case the habeas court believed the new evidence. I believe that, if it is assumed that *Elizondo* can apply to convictions resting upon a guilty plea, the record is sufficient to support the habeas court's recommendation. Under these circumstances, now that the record is before us, I would answer the second question "yes" and grant applicant relief.

I respectfully dissent.

HERVEY, J., filed a dissenting opinion to the denial of the State's Motion for Rehearing, in which KEASLER, J., joined.

Applicant still stands legally convicted of aggravated sexual assault of a child based

---

1. *Ex parte Elizondo,* 947 S.W.2d 202 (Tex. Crim.App.1996).

2. *Id.* at 206.

3. 72 S.W.3d 671 (Tex.Crim.App.2002).

on a knowing and voluntary guilty plea. Rather than seeking to set aside this plea under well-developed law that habeas corpus applicants routinely use to set aside guilty pleas, applicant claimed in this habeas proceeding that he is entitled to habeas corpus relief because he is actually "innocent" of this offense.

On original submission this Court granted applicant habeas corpus relief on his "actual innocence" claim without setting aside his voluntary guilty plea. After our opinion on original submission, the habeas court granted applicant a bond that apparently was not authorized by law. Since applicant is back on the streets, then arguably there is no illegal "restraint" and this Court should consider whether to dismiss applicant's habeas corpus application and withdraw its prior opinions. *See Ex parte Eureste,* 725 S.W.2d 214, 216 (Tex.Cr.App. 1986).

I would, however, reconsider the Court's opinion on rehearing and deny habeas corpus relief. Applicant was tried before a jury for the aggravated sexual assault of a child offense in 1997. While the jury was deadlocked on the issue of applicant's guilt/innocence, applicant pled guilty to the offense and he received a bargained-for benefit of 10–years deferred adjudication. In 1999, after committing another criminal offense, applicant's guilt for the aggravated sexual assault of a child offense was adjudicated and he received a 10–year prison sentence.

In 2002, the imprisoned applicant filed this habeas corpus proceeding to present what he claimed was "new" evidence that establishes his innocence under our decision in *Ex parte Elizondo,* 947 S.W.2d 202

(Tex.Cr.App.2002).[1] *Elizondo* requires applicant to "unquestionably establish" his innocence on habeas corpus. *See Elizondo,* 947 S.W.2d at 209. This is a heavier burden than the State's burden at trial to prove guilt beyond a reasonable doubt primarily because applicant's error-free conviction "is entitled to the greatest respect" in this habeas corpus proceeding. *See id.*

The habeas court decided that applicant met this burden. On original submission, this Court agreed and decided that applicant's "new" evidence unquestionably established his innocence. This Court based its decision solely on the habeas court's findings without conducting an independent examination of the record of applicant's 1997 trial and without requiring that this record be made a part of the habeas record.

The habeas record reflects that the habeas judge was the same judge who presided over applicant's 1997 trial. The habeas record also reflects that the habeas court's findings refer to and are based on selected portions of the record from applicant's 1997 trial. The habeas record also reflects that the habeas court's findings are based on its personal "recollection that the evidence of Applicant's guilt [at his 1997 trial] was severely deficient." These findings state:

> In determining that Applicant's [new] evidence is of significantly greater credibility than any evidence offered at Applicant's trial, this Court necessarily had to engage in such a "weighing" of exculpatory evidence against evidence of guilt. While the process of recalling two days of testimony provided four-and-a-half years ago would normally require an

---

1. This Court on original submission rejected the claim that *Elizondo* should not apply to guilty-pleading defendants. *See Ex parte Tuley,* op. at 395 (Tex.Cr.App. December 18,

2002); *but see Tuley,* op. at 399–400 (Hervey, J., dissenting) (permitting *Elizondo* to apply to guilty-pleading defendants compromises the integrity of the judicial process).

exhaustive review of the transcripts, such is not the case in the instant proceeding. Despite the passage of time, and cases, the Court finds that its recollection of the proceedings before it on July 1–3, 1997 has not diminished over the interval. The Court attributes this clarity of recollection to the exceptional nature of the testimony adduced before it during the trial.

In reviewing the proceedings of Applicant's trial for purposes of Applicant's hearing, this Court has reaffirmed its recollection that the evidence of Applicant's guilt was severely deficient. Of perhaps greater significance though for the purpose of Applicant's writ, this Court specifically recalls the majority of evidence presented at trial was highly implausible at best. Having reviewed the proceedings at Applicant's trial, this Court finds that Applicant's characterization of the evidence against him at trial is accurate, and fairly characterizes the tenor of this evidence. (Citation To Applicant's Habeas Corpus Application Omitted).

In a motion for rehearing, the State claims, among other things, that this Court should not have granted habeas corpus relief without independently examining the record of applicant's 1997 trial. The State claims that an independent examination of the record from applicant's 1997 trial shows that the "new" evidence applicant presented in this habeas corpus proceeding does not unquestionably establish applicant's innocence of the aggravated sexual assault of a child offense. The State also claims that the evidence applicant pre-

sented in this habeas corpus proceeding is not "new." After the Court's decision on original submission, the habeas record was supplemented with the reporter's record of applicant's 1997 trial.

## I. INDEPENDENT EXAMINATION OF THE RECORD FROM APPLICANT'S 1997 TRIAL

Our decision in *Elizondo* clearly requires this Court to independently examine the record from applicant's 1997 trial. *See Elizondo*, 947 S.W.2d at 206, *see also Ex parte Franklin*, 72 S.W.3d 671, 677 (Tex.Cr.App.2002). *Elizondo* states clearly:

> Because, in evaluating a habeas claim that newly discovered or available evidence proves the applicant to be innocent of the crime for which he was convicted, our task is to assess the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole, we must necessarily weigh such exculpatory evidence against the evidence of guilt adduced at trial.

*Elizondo*, 947 S.W.2d at 206; *see also Franklin*, 72 S.W.3d at 677.

The Court's opinion on original submission found it unnecessary to independently examine the record of applicant's 1997 trial apparently by shifting this duty exclusively to the habeas court. *See Ex parte Tuley*, op. at 390 ("the convicting court weighs the evidence of the applicant's guilt against the new evidence of innocence").[2] The Court's opinion on original submission supports this proposition with a citation to page 207 of *Elizondo* which states that the "habeas

---

2. Even so, this Court should review the record from applicant's 1997 trial to determine whether the record supports the habeas court's recollections and findings which is what we do in other habeas cases that come before this Court. It is also difficult to understand how, without an independent examina-

tion of the record from applicant's 1997 trial, the Court's opinion on original submission could state that the "record supports a finding that the [complainant's] recantation is more credible than the testimony at trial." *See Tuley*, op. at 397.

court, as factfinder" is to weigh the evidence of guilt at trial against the new evidence of innocence. *See Elizondo*, 947 S.W.2d at 207.

But this reads *Elizondo* with blinders on and ignores other significant parts of this decision requiring this Court to compare the evidence of guilt at trial against the new evidence of innocence presented on habeas corpus. *See Elizondo*, 947 S.W.2d at 206 (this Court must weigh the newly discovered evidence of innocence against the evidence of guilt) and at 207 (this Court's job is to "decide whether the newly discovered evidence would have convinced the jury of applicant's innocence") and at 209 (applicant entitled to habeas corpus relief if "applicant can prove by clear and convincing evidence to this Court, in the exercise of its habeas corpus jurisdiction, that a jury would acquit him based on his newly discovered evidence").[3] If it was the intent of this Court on original submission to decide that only the convicting court should independently examine the evidence of guilt at trial and compare it against the new evidence of innocence, then this Court overruled *sub silentio* significant portions of *Elizondo*.

## II. APPLICANT'S CLAIMED PERJURIOUS GUILTY PLEA

The Court's opinion on original submission accepted the habeas court's findings that applicant's voluntary guilty plea (which applicant now claims was a lie) is not "indicative of any credible admission of guilt" because the plea was influenced by various factors many of which face most guilty-pleading defendants. *See Tuley*, op. at 395. The habeas court found:

> . . . However, notwithstanding the Court's acceptance of Applicant's plea on July 3, 1997, the Court believes Applicant's assertion that his plea was entered solely for the purpose of extricating himself from the situation he found himself in, and as such was not indicative of any credible admission of guilt.
>
> Given Applicant's prolonged incarceration, the specter of further incarceration, the fact that Applicant could no longer retain private counsel, and Applicant's assertion that he was addicted to narcotics during this period, the Court finds that Applicant has made such an affirmative showing as to dispel the presumption of regularity and veracity implied to recitals of guilt in open court. Furthermore, this Court recommends that in light of Applicant's evidence of actual innocence, as this Court will now detail, Applicant's plea should not be dispositive of the determination of Applicant's claim.

These findings, however, are responsive only to the State's claim on original submission that applicant's claimed perjurious guilty plea precludes him from even raising an *Elizondo* claim. While these findings may permit applicant to raise an *Elizondo* claim, they do not address how much weight to assign to applicant's judicial admission of guilt in the *Elizondo* analysis.[4] The *Elizondo* analysis of deter-

---

**3.** Weighing the new evidence of innocence against the evidence of guilt under *Elizondo* does not involve credibility and demeanor determinations. *See generally Guzman v. State*, 955 S.W.2d 85, 87–89 (Tex.Cr.App.1997); *Elizondo*, 947 S.W.2d at 206, 209 (habeas corpus applicant must show by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence

compared to the "evidence of guilt adduced at trial").

**4.** In its motion for rehearing, the State asserts:

> The applicant's plea of guilty should be more than a mere springboard for the Court's assessment of the credibility of the new evidence. That is, even though the

mining whether a rational juror would acquit based on a guilty-pleading habeas corpus applicant's new evidence must take into account that this rational juror would also have to consider that this applicant voluntarily admitted his guilt. *See Elizondo,* 947 S.W.2d at 209. This should be an important part of the *Elizondo* analysis since an applicant's voluntary admission of guilt normally and *"quite validly* removes the issue of factual guilt from the case." *See Menna v. New York,* 423 U.S. 61, 96 S.Ct. 241, 242 n. 2, 46 L.Ed.2d 195 (1975) (emphasis in original); *McGlothlin v. State,* 896 S.W.2d 183, 190 (Tex.Cr.App.) (Meyers.J., dissenting), cert. denied, 516 U.S. 882, 116 S.Ct. 219, 133 L.Ed.2d 150 (1995). Neither the habeas court nor this Court on original submission weighed applicant's judicial admission of guilt and the other evidence "adduced at trial" against the new evidence as required by *Elizondo,* 947 S.W.2d at 206.

Assuming, therefore, that *Elizondo* applies to a guilty-pleading habeas corpus applicant, it is appropriate to note that, in conducting the *Elizondo* weighing analysis, a reasonable juror would not have to accept applicant's excuses for pleading guilty. A reasonable juror could determine that applicant's guilty plea is a credible admission of guilt since it is not unreasonable to infer that applicant could have decided that 10–years deferred adjudication was a pretty good deal for someone who sexually molested a 12 year-old girl on a regular basis for a year and-a-half. *See Elizondo,* 947 S.W.2d at 209 (habeas appli-

cant must show by clear and convincing evidence that a reasonable juror would acquit him based on his newly discovered evidence). And, it is also appropriate to note that a reasonable juror could consider that applicant is an admitted liar. *See id.*

## III. RECORD OF APPLICANT'S 1997 TRIAL

The evidence from applicant's 1997 trial showed that applicant and the complainant's mother had a sexual relationship. Applicant moved in with the complainant's family (the complainant, the complainant's mother, and the complainant's younger sister) in March 1995 when the complainant was twelve years-old. The complainant's mother testified that the sexual relationship between her and the applicant "pretty much stopped" within a month after applicant moved in with the complainant's family. The complainant's mother also testified that applicant spent much of his time alone with the complainant and that the complainant's behavior drastically changed for the worse within about a month after applicant moved in with the family.

The complainant testified that applicant began to sexually molest her about a month after applicant moved in with the complainant's family. The complainant also testified that applicant sexually molested her on a regular basis until his arrest in September 1996 when the complainant was 13 years-old. She specifically described three incidents in which applicant molested her, with each incident in-

Court may believe that the voluntariness of the applicant's guilty plea has been impeached, that belief does not purge the guilty plea from the Court's weighing analysis. A necessary constituent of that analysis is the applicant's plea of guilty and judicial confession. In other words, has the applicant shown by clear and convincing evidence that no reasonable juror would have convicted him in light of not only the new

evidence *but also in light of his plea of guilty and judicial confession that he, in fact, committed the crime?* While it should not be an impossible burden, a showing by clear and convincing evidence that no reasonable juror would have a[sic] convicted a person, in the face of that person's plea of guilty and judicial confession, should be an extraordinarily difficult one to sustain.
(Emphasis In Original).

volving penetration (the abandoned house incident, the incident during a camping trip at a lake in Oklahoma, and the last incident at the complainant's home that occurred shortly before applicant's arrest).[5]

Other than testifying that he was "in fact guilty" when he pled guilty, applicant did not testify at his 1997 trial. He nevertheless presented a defensive theory that the complainant's mother and the complainant's aunt encouraged the complainant to falsely accuse applicant of sexually molesting the complainant because the mother wanted the applicant gone. In support of this theory, applicant relied on evidence that in September 1996 the mother went to a hotel after giving applicant an ultimatum to be out of the house by noon the next day because the mother thought applicant "was seeing a lot of girls." The aunt was unhappy when she spoke with the mother at the hotel and learned that the mother had left the complainant with applicant. The mother and the aunt made arrangements for the grandmother to get the complainant away from applicant.

Q. How were you feeling that night at the hotel?

A. Well, I was upset, because I thought—or I still believed that [applicant] was seeing a lot of girls, so I packed me a bag and I went to the hotel and I called [the aunt] and told her about [the complainant].

Q. Were you upset?

A. Yes.

Q. What was [the aunt's] reaction to your leaving [the complainant] with [applicant]?

A. She said if he—

[APPLICANT]: I'd object to hearsay, Your Honor.

[THE COURT]: Sustained.

Q. Was [the aunt] happy about it? Don't tell me what she said, but was she happy?

A. No.

Q. What did you do next after speaking to [the aunt]?

A. We called my mom, and we told my mom to go knock on [the complainant's] window, because she had a habit of doing that, just go knock on your window,

---

5. The habeas court made no specific findings regarding the last incident at the complainant's home. The habeas court recollected "vast inconsistencies in the [1997 trial] testimony regarding a blood stained shirt" in connection with the incident at the lake in Oklahoma. The habeas court found that the complainant's description of the first incident at the abandoned house had "dubious veracity." The habeas court stated:

> Of further dubious veracity was [the complainant's] testimony of the first assault. Alleged to have occurred in an abandoned house that could no longer be located, [the complainant] testified that there was a bed, with bedposts, a stand by the bed, and a screen which to change behind. (Citations To Record Of Applicant's 1997 Trial Omitted). After volunteering that "[applicant] did have a condom on," [the complainant] testified that [applicant] "raped" her, and then cut her face with a box cutter. (Cita-

tions To Record Of Applicant's 1997 Trial Omitted). After testifying that she put her clothes back on and left the house, she then recalled that first she went to the bathroom where she "washed off the blood" from her face and then dried it. (Citations To Record Of Applicant's 1997 Trial Omitted). Asked how old she was when "this was happening," [the complainant] stated "Ten." Told to "Go Ahead," [the complainant] then stated that "I—I was just thinking about how mad I am—I was at—at [applicant], and my mom for letting someone like that come into our lives." (Citations To Record Of Applicant's 1997 Trial Omitted). As this Court recalls, and as Applicant points out, the State had already established that [the complainant] was 12 years old when Applicant moved in with them. (Citation to Applicant's Habeas Brief Omitted).

and ask her to go washing with her. So I told mom, "Go knock on the window and ask [the complainant] to go washing with you, and then bring her to the house."

Q. Were you and your sister concerned about [the complainant's] well-being?

A. Yes.

The aunt picked the complainant up from the grandmother's and took her to the hotel. The complainant then told them that applicant had been sexually molesting her. The mother called the police who arrived at the hotel shortly thereafter and began to interview the girl outside the presence of her mother and aunt. The mother testified that the complainant was at the hotel "not even five minutes" before the mother called the police.

Q. How long was [the complainant] at the hotel before you all called the police or anyone?

A. Not even five minutes.

Q. Not even five minutes.

How did [the complainant] get to the hotel?

A. [The aunt] picked her up from [the grandmother's].

The aunt, however, testified that the complainant was at the hotel approximately an hour and-a-half before the mother called the police.

Q. Okay. Prior to you and [the mother] calling [the police], you speak with [the complainant] for approximately an hour and-a-half; is that correct?

A. That's what I would estimate. I couldn't be positive.

Q. You don't—you weren't looking at your watch?

A. No.

Q. But you—you know it was a good bit longer than your phone conversation?

A. Yes.

Q. No question in your mind about that?

A. Yes.

Q. Was there ever a time when [the complainant] was speaking in the hotel room that [the mother] would not have been present?

A. With the police officers when we stepped outside.

Q. That would have been the only time?

A. Uh-huh.

Q. So whatever you hear, she heard, whatever [the complainant] was saying?

A. Yes.

Q. Without saying what [the complainant] said, did you, in your mind, have a good idea of—of—of what went on, if anything, at all?

A. Did I have an—I did before she even told me or—

Q. After she spoke for the hour and-a-half, did you—did you feel like you had a good idea as to what was going on?

A. Yes.

Q. Did you say yes?

A. Yes.

Q. Did you feel like there were details left out?

A. As far as what [the complainant] told us?

Q. Correct.

A. Yes.

Q. Was it—was it sketchy what she said, or was it a complete story from start to finish?

A. No, it was brief stuff.

Q. Brief stuff?

A. Like she was embarrassed to say it in front of [the mother].

The complainant provided no testimony on how long she was at the hotel before the mother called the police.

Q. But [applicant] wasn't okay, was he? [Complainant], a couple of days after this incident at your house on Prospect, [the mother] went to stay at a hotel. Do you remember that?

A. Yes.

Q. And early that morning you finally told, do you recall?

A. (Nods head.)

Q. Did you tell [the mother] and [the aunt] lots of details?

A. No, I—some of what I told them was that, you know, that he did it. And there was—was no details at all. I—

Q. What did you say to them?

A. Well, I—I talked to my mother from [the grandmother's] house on the phone,[6] and she says—she was telling me all the stuff that she finally figured out about [applicant]. That he was using her for her money and drugs and letting other guys rape her.

[APPLICANT]: Your Honor, I'm going to object to this as non-responsive.

[THE COURT]: Overruled.

Q. Did you tell her that [applicant] was having sex with you?

A. I didn't come out with it. I wasn't planning to. And she says, "Has [applicant] been touching you?"

And I thought about it for a minute thinking, you know, I better not do it, because, you know, he might—he will kill me. And—but then again, at that point in time, I hated myself so much, I—I didn't care.

Q. Did you care if you lived or died anymore?

A. No, and—and at first I said, "No." I said, "No."

And she goes, "Are you sure?"

And I thought about it again. And then I told her, "Yes," because I didn't—I didn't care anymore. I—and the picture of the family was long gone.

Q. Did you want to share with her all the details of—of what he had done to you?

A. No.

Q. Why?

A. I was—I was afraid she was going to be mad at me.

Q. Why would you be afraid that she would be mad at you?

A. I don't know.

Q. Did you think that she loved him more?

A. Yes.

Q. Did someone call [the police] that day?

A. [The mother] did.

Q. And what happened after that?

A. The police came over and talked to me, and to [the mother] and to [the aunt].

Q. Did you get a chance to talk to the police alone—

A. Yes.

Q. —and tell them details of what had—what had happened?

A. (Nods head.)

The first police officer to arrive at the hotel testified that the mother, the aunt, and the complainant were "very upset" and that the complainant was crying. He testified that "they were excited" and that "something had happened."

Q. How about [the complainant]?

A. Not—not about it actually happening until we got to the hotel.

---

6. The complainant later testified that she did not make an outcry until she was at the hotel.
Q. You didn't talk to her at all?

A. [The complainant] was—she was crying. She had her head lowered. She wasn't saying anything to anyone. Embarrassed. You could tell she was emotionally upset also.

Q. Was she withdrawn?

A. Very much withdrawn.

This officer also testified that the complainant told him "what had happened to her up to a point" but because "of the nature of the situation" he called for a female officer (Waller) who questioned the complainant alone for "quite awhile." The male officer who first arrived at the scene also testified that they went from the hotel to the mother's home where he arrested applicant based on information that the complainant provided to the female officer.

A. . . .

At that point, I asked her, [the complainant], if she would feel more comfortable speaking with a female officer. And she said, yes.

Q. And so what did you do?

A. At that time, I called for Officer Waller, who is a female, to come to the location and assist with the questioning of [the complainant] on what happened.

Q. Why Officer Waller?

A. I—it wasn't actually Officer Waller, I just asked for a female officer, and she is the one that was—that responded.

Q. What happened at that point when she arrived?

A. She came to the location. Once she arrived, I stepped out of the room with [the complainant's mother] and [the aunt] and let Officer Waller talk with [the complainant] alone in the room about what had happened.

Q. Why did you want her to be alone with Officer Waller?

A. Well, obviously, she didn't feel as comfortable with me being around as

she would be with—as I felt she would be with another female officer.

And by having her in a room by herself, that would allow her to be more free to discuss things that she did not want her mother to know about.

Q. Is that common practice when dealing with a child that has been sexually abused?

A. Yes, ma'am.

Q. About how long did Officer Waller talk to [the complainant]?

A. Well, I can't give you a time, but it was quite awhile.

Q. When they came out of the room, how was [the complainant]?

A. Well, [the complainant] did not come out of the room. Officer Waller— Waller came out of the room and spoke with me, and it wasn't until we left the motel that [the complainant] left the room.

Q. Did Officer Waller tell you what [the complainant] had told her?

A. Yes, ma'am.

Q. Based on that information, what did you do next?

A. Based on that information, we went over to the offense location, which was [the complainant's] and her mother's home, and—to locate our arrestee. We went to that location and knocked on the door and—

Q. Who went to the location with you?

A. Officer—my cover officer, Officer McClain.

Q. Did [the complainant] go there?

A. I don't believe so. I believe that she was taken with Officer Waller, along with her mother, and I believe [the aunt], to the child—Children's Advocacy Center to be interviewed by them.

Q. And you said that you went—based on the information that you had, you

went to the duplex to do what—or the triplex?

A. To try to locate the suspect and to make an arrest.

Q. And what happened when you got to the triplex?

A. I knocked on the front door, and the suspect answered the door. And he was immediately placed under arrest.

The female police officer (Waller) testified that the complainant gave her a statement at the hotel. This female officer described the circumstances under which the complainant provided this statement and the general techniques she uses to insure the reliability of these types of statements.

Q. Why were you dispatched out there [to the hotel]?

A. I wasn't dispatched, another element received a call, but they called for a female element because the complainant was real upset. The officer didn't feel like she would respond to him, so he wanted a female to come and talk to her.

Q. And what did you do when you arrived there?

A. I talked to the officer who originally got the call, and he explained to me the situation. And I talked with her mother first alone in the room, and then I talked to [the complainant] in the room alone.

Q. Why did you speak with her alone?

A. Well, when I got there, I could tell she was upset because she was crying. And a lot of times to me, their mother or, you know, whoever's—whoever they're with, to me that seems to pacify them. They stay in that "I'm a baby state," you know, and I wanted to get her out of there and get her alone and just kind of open up to her and kind of relate to her some of my own life experience and make her feel comfortable with me so she can open up.

Q. And have it be a one-on-one conversation?

A. Yes, because there might be some things that she doesn't want to say around her mother.

Q. What was her demeanor when you went into the room? How did she act?

A. Withdrawn, scared, very upset. She was crying. She did appear to me like she was ready to talk, because she was tired of what was going on.

Q. Tired of keeping it in?

A. Yeah.

Q. When you talk to children or adults who have been sexually abused, what type of questions do you ask of them?

A. I ask them how old they are. And how many—you know, do you have any sisters or brothers, and—

Q. And you try to make them comfortable at first?

A. Yes.

Q. When you actually start to talk about the sexual abuse, how do you approach that?

A. I ask them do they know what sex is, because, I mean, I talk to children as young as five, sometimes, and I want to make sure they know what sex is. And sometimes I might have to tell them, you know.

Q. Did [the complainant] know what sex was?

A. Yes, she did.

Q. Was she able to give you details about what sex was?

A. Yes, she did.

Q. When you spoke with her, was she able to give you details about sex with [applicant], [the mother's] boyfriend?

A. Yes.

Q. Would you ask her open-ended questions such as what happened next? Then what happened?

A. Yes.

Q. Versus leading questions?

A. Yes.

Q. And why? Why would you do that?

A. Because it's her story. It happened to her. She needs to tell me what happened. I can't tell her what happened.

Q. And was she able to do that?

A. Yes.

Q. Was she able to tell you about just one incident, or were there more?

A. There were more.

Q. There were more.

A. I asked her—she told me about the initial incident, the one that we were called on. I asked her if it had happened to her before, and she said, yes. And I asked her, when? And she told me—

[APPLICANT]: Objection, hearsay, Your Honor, what [the complainant] told her.

[THE COURT]: Sustained.

Q. Was she able to give you details of other incidents?

A. Yes.

Q. Did she seem frightened?

A. Yes.

Q. Of what?

A. Of [applicant].

An investigator with the City of Dallas Child Abuse Unit testified that he interviewed the complainant at a children's advocacy center later that day and that the complainant provided detailed information that was consistent with the information the complainant provided Waller.

Q. Was [the complainant] eventually able to tell you what had happened to her?

A. Yes, she was.

Q. Was she able to give details?

A. Yes, she was.

Q. After interviewing her—I'm—did you have an opportunity to speak with Officer Waller?

A. Yes, I did.

Q. Do you recall if it was prior to or after you interviewed [the complainant]?

A. It was prior to.

Q. The information that [the complainant] gave you during your interview, was it consistent with what Officer Waller had told you?

A. Yes, it was.

Q. Did you also—when you're interviewing a child, what type of questions do you generally ask?

A. Open-ended questions, where pretty much we'll allow the person to tell me what happened, not—

Q. And why do you do that?

A. Because I—your whole premise is not to lead the person on. Let them tell you in their own words as to what happened.

Q. And did you do that with [the complainant]?

A. Yes, I did.

Applicant's defensive theory that the mother and the aunt encouraged the complainant to falsely accuse applicant because the mother wanted him gone figured prominently in applicant's closing jury arguments.

What does [the mother] do? She leaves [complainant] and [the younger daughter], we're not real clear on whether [the younger daughter] was there or not, in the house with [applicant]. There's no problem until they start talking, and [the aunt] hatches the plan. You want to figure a way to get [applicant] out of this house?

She says they had five phone calls. First one a couple of minutes and the second one's five minutes. The third

one's five minutes. The fourth one's five minutes. And the fifth one's five minutes and the sixth one's five minutes. They call a couple of minutes, three minutes, four minutes. They're on the phone. An hour and 15 minutes later, they pick up [the complainant] and they don't tell [the grandmother] why they're picking her up in the middle of the night or anything like that. So where's the hour and 15 minutes? I'll tell you where it is. They're on the phone hatching the plan to—

[THE PROSECUTION]: Your Honor, I'm going to object. That's not in evidence.

[THE COURT]: Overruled.

Now, what else do we know? Pick up [the complainant] 5:15, get to the hotel about 5:30. [The mother] says they talked to [the complainant] for five minutes and they call [the police]. [The aunt] says, "We talked an hour and a half, and then called [the police]."

That hour and a—and-a-half they talked was when [the mother] and [the aunt], it's a reasonable deduction, talked with [the complainant] before they got there, and then [the complainant] gets there and they talk about five minutes. We're not even clear who's there because they can't really remember. Then [the complainant] tells us [the aunt] was there, but [the mother] says, "I borrowed [the aunt's] car and [the aunt] wasn't there." Who's there? That wasn't that important when they figured that out.

The prosecution responded to the defensive theory that the complainant fabricated the accusations by commenting that [the complainant] told the same basic story each time she gave a statement to the police.

[The complainant] made it up because her mom didn't like [applicant] anymore?

Ladies and gentlemen, to believe that, if you listen to Defense's argument, mom and sister got together for an hour and-a-half and talked about it, and then spent five minutes with [the complainant] to tell her all these details. To be—to plant in her mind an abandoned house, a camping trip, a bike ride and an event that happened in the home while you're doing your homework. That jump over the table. That knocks you down. All those things in five minutes.

And not only are—they are so good at manipulating this child, she's going to do this for them. But that—she's consistent. Her story is basically consistent time and time and time again.

[The complainant] goes alone with Officer Waller and she tells her all these intimate little details. Then she tells Detective Johnson. Then she comes back and talks to the prosecutor. And then she tells you nine to ten months later.

And, ladies and gentlemen, it's the same. It's the same basic story. One detail is who pulled the pants all the way down. A little—little details are a little different, but the basic story is the same. About the house, about the camping. Every time. After five minutes with mom, she—and mom's not in the room to help her. She has to do it on her own at 13 years old.

The record from applicant's 1997 trial further reflects that applicant pled guilty in exchange for 10–years deferred adjudication while the jury was deadlocked on the issue of applicant's guilt/innocence.[7]

---

7. The 1997 trial record is silent on how the jury vote was split when applicant pled guilty.

Applicant presented in support of his habeas application an affidavit from one of the jurors

After determining that applicant freely and voluntarily pled guilty and hearing applicant's assertion that he was "in fact guilty," the trial court accepted applicant's guilty plea, declared a mistrial, and discharged the jury.

## IV. THE "NEW" EVIDENCE

After his deferred adjudication had been revoked for committing another criminal offense and applicant went to prison, he filed this habeas corpus application. Applicant claims in this proceeding that he discovered all this "new" evidence establishing his innocence after he went to prison.

### A. The Complainant's Affidavit

Applicant submitted an affidavit from the complainant as "new" evidence in support of his habeas application an affidavit from the complainant. The complainant stated in this affidavit that "everything" she testified to at trial was "false" and that applicant "never assaulted [her] in any way whatsoever." The complainant also stated in her affidavit that she wanted applicant gone because he mistreated the mother and that accusing him of molesting her "seemed like a good way to get [applicant] out of [the] house." [8] Among other things, the complainant's affidavit states:

> In 1996 I told my mother that [applicant] had sexually assaulted me. I didn't plan to do this, until the moment that she asked me whether he had done anything to me. I did it because I wanted [applicant] out of my life and my mom's life. I blamed him for getting her involved with drugs, and for her

who stated that the jury was split 10–2 in favor of acquittal. There is nothing in the 1997 trial record indicating that applicant knew this when he pled guilty.

**8.** Applicant did not submit any "new" evidence from either the mother or the aunt recanting any of their testimony from appli-

then getting fired from her job. I also knew that he was physically abusive to her, as I had seen him slap her a couple of times, and I also saw bruises on her. She had also told me that she believed he had given her a disease. At the time, it just seemed like a good way to get him out of our house.

The complainant did testify at applicant's 1997 trial that applicant mistreated the mother. The complainant also explained why, soon after applicant's arrest, she told her boyfriend (Graham) that applicant did not molest her—because she "was humiliated and couldn't let him know."

Q. Did you tell anybody that—that it didn't happen?

A. Yes.

Q. Who?

A. I told—I told the boy that was my boyfriend at the time.

Q. Why did you tell the boy it didn't happen?

A. Because I was humiliated and couldn't let him know, and—

Q. Did he know your friend also?

A. I mean, he knew Amelia, kind of.

Q. You—did you want everybody to know what had happened to you?

A. I didn't want anybody to know.

Q. Did you want it to just go away?

A. (Nods head.).

### B. The Affidavit Of The Complainant's Best Friend (Amelia Starr)

cant's 1997 trial. The complainant also stated in her affidavit that:

> While my mother refuses to discuss what happened, I believe she knows the truth now. I also believe that my aunt, (aunt's name), also knows the truth.

Applicant also submitted as "new" evidence in support of his habeas corpus application an affidavit from the complainant's best friend (Starr) who was the only witness to testify live at the habeas hearing.[9] Starr's affidavit states, among other things, that the complainant told her after applicant's arrest that the complainant had fabricated the charges against applicant because the complainant hated applicant. Starr's affidavit also states that the complainant made the outcry statement to her mother and aunt when "they were all gathered at a hotel."

> [The complainant] told me that she made this up because she hated [applicant], as he was physically abusive to [the mother]. [The complainant] stated that she just wanted [applicant] out of the house. [The complainant] stated that she told [the mother and the aunt] of [applicant's] abuse when they were all gathered at a hotel. [The complainant] told me that [the mother] questioned her about whether [applicant] had ever done anything to her, at which time she told them he had.

Starr testified consistently with this portion of her affidavit at the habeas hearing and she also testified that she was surprised to learn that the complainant lied when the complainant accused applicant of molesting her.

> Q. What—what—what did [the complainant] tell you?
> A. She told me that it didn't happen. Basically she said that—you know, I told her that—that everyone was upset. And she was like, "I know, but I have to tell you the truth."
>
> And I was like, "Well, what do you mean?"
>
> And she told me that it didn't happen. She said that her mom and her aunt had been discussing things as far as, I guess, [applicant] and her mother's relationship, I don't know. And they went to [the complainant] and asked her, you know, if [applicant] had ever bothered her or anything like that. And so, I guess, she took the opportunity because she was unhappy in the house with [applicant] there. To use that I guess. And she said that—so she went ahead and said, yes, that he had raped her and that was basically—
>
> Q. Were you—were you surprised?
> A. Yeah—that she was lying?
> Q. Yes.
> A. Yes.

Starr also stated in her affidavit that in September 1996 the complainant told Starr that applicant had been molesting her.

> In September of 1996 [the complainant] told me that [applicant] had been molesting her. [The complainant] did not tell me any details of what occurred. She also told me that she had told her mother this as well a few days earlier.

Starr testified at the habeas hearing, however, that this was not true and that

---

9. This testimony covers about 25 pages in a reporter's record. All the other "new" evidence applicant presented was in the form of affidavits. The reporter's record from the habeas hearing also indicates that the rest of the habeas hearing was scheduled for a later date. No further hearing appears to have been held.

> [THE COURT]: You may call your next witness.

> [APPLICANT]: Your Honor, we have no further witnesses until—
> [THE COURT]: Okay. This is all you want to do today?
> [APPLICANT]: Yes, Your Honor. The rest is scheduled for February 1st, Your Honor.

her "mother's the one who told [her]." [10]

Q. Ms. Starr—

A. Yes.

Q. —did [the complainant] ever tell you that [applicant] had in fact raped her?

A. Yes.

Q. When did she do that?

A. I'm sorry, I[sic] didn't—can you repeat the question?

Q. Did [the complainant] ever tell you that she had been raped?

A. Did [the complainant]? No, she didn't.

Q. Okay. Did you come up and make an affidavit in July of this—last year?

A. Yes.

Q. Do you recall signing it?

A. Yes.

[THE PROSECUTION]: Your Honor, may I approach?

[THE COURT]: Yes.

[COURT REPORTER]: I'm sorry, could you repeat what you just said.

[THE PROSECUTION]: I asked her to read paragraph number two [of her affidavit].

A. Okay. In September of 1986[sic], [the complainant] to me [sic] that [applicant] had been molesting her. [The complainant] did not tell me any details, just that it had occurred. She also told me that she had told her mother this as well.

Q. Did that happen?

A. Actually, no, my—mother's the one who told me.

Q. Did you write this affidavit?

A. Did I write—I read it and signed it, yes.

Q. So you agreed to what it said at the time?

A. Yes.

Q. But it's quite different than what you're saying now?

A. Yeah, I didn't—I don't know if I didn't catch it or what, but, yeah, it's different. It's—my mother told me.

(Emphasis Supplied).

It is also significant that Starr testified at the habeas hearing that she thought she would have told "the truth" at applicant's 1997 trial had applicant's attorneys contacted her during or before trial.

Q. Did anyone contact you from—from—[applicant's] attorneys during the trial or before the trial?

A. No.

Q. Okay. Do you think that if someone had, an investigator, let's say, that you would have told them the truth?

A. I think so, just because of the fact that, you know, I—I was younger. And to have an opportunity come to me around say, look, this—you know, I don't think either of us anticipated it to be such a big deal. And, of course—of course, it was. But it just—I didn't have authorities asking me questions, so all I knew was that, you know, I could— I could keep this promise and, you know, that was that. So had authority come to me, I think it would have been a bit scarier, and so I think it would have probably scared me into telling the truth.

### C. The Affidavit Of The Complainant's Former Boyfriend (Graham)

Applicant also submitted as "new" evidence in support of his habeas corpus

---

**10.** The *Elizondo* analysis of determining whether a rational juror would acquit based on applicant's "new" evidence must also take into account that this rational juror would have to consider that Starr's affidavit setting out applicant's "new" evidence is not completely truthful by Starr's own admission. *See Elizondo,* 947 S.W.2d at 209.

application an affidavit from the complainant's former boyfriend (Graham). His affidavit states that the complainant told him after applicant's arrest that she had falsely accused applicant of molesting her. Graham's affidavit states:

> In September 1996, sometime after [applicant] was arrested. [the mother] told me that [applicant] had been arrested for raping [the complainant]. I was really shocked when she told me this and I called [the complainant] after this, and asked her to tell me what happened. [The complainant] told me that she had lied about it because she hated [applicant] and wanted him to leave. She told me not to tell anyone that was lying [sic], and that I was the only one who knew the truth.

Graham's affidavit also states that he kept this information to himself until he decided to share it with applicant's attorney during a break in applicant's 1997 trial. Graham's affidavit further states that applicant's attorney put him on the stand at applicant's 1997 trial "but for some reason he never asked [Graham] about what [the complainant] had told [Graham]." Graham's affidavit states:

> I attended [applicant's] trial, and continued to try and talk [the complainant] out of going ahead with it. After sitting through some of the trial though, I decided that I should say something. During one of the breaks, I told [applicant's] attorney what [the complainant] had told me. The attorney told me that he wanted me to testify, and that he would see if I still could. [Applicant's] attorney put me on the stand, but for some reason he never asked me about what [the complainant] had told me.

The record from applicant's 1997 trial reflects a different scenario. This record reflects that, during a hearing outside the jury's presence, applicant's attorney put Graham on the stand. Graham testified that he approached applicant's attorney during trial and told him that the complainant told Graham two days after applicant's arrest, that she had fabricated the accusations against applicant. The trial court decided that applicant could not present that evidence to the jury without recalling the complainant and setting the "foundational requirements."

Q. And did you have a conversation with [the complainant] on September 16, 1996?

A. Most likely.

Q. Was it a couple of days after some events occurred out there and [applicant] was arrested?

A. Yes.

Q. Two days after—after his arrest; is that your understanding?

A. Yes.

Q. Now, you were in the courtroom yesterday; is that true?

A. Yes.

Q. And did you hear some testimony from [the complainant's] mother?

A. Yes, I did.

Q. Do you know who she is?

A. Yes.

Q. What's her name?

A. [Names the mother].

Q. There was a break yesterday or Monday, I guess—no, it was yesterday—where you and I had a conversation out in the hall; is that right?

A. Yes.

Q. And you told me something about this conversation that you had with [the complainant] on approximately September 16th of 1996; is that right?

A. That's right.

Q. And you and I never had this conversation before; is that right?

A. Right.

Q. As a matter of fact, you called my attention to this conversation; is that true?

A. Yes.

＊　＊　＊　＊　＊　＊

Q. And what do you understand was the reason that [applicant] had been arrested?

A. [The mother] had—had told me that [applicant] had been arrested for raping [the complainant] for a year and-a-half.

Q. Did you call [the complainant] on the 16th of September and talk to her?

A. Yes, I did.

Q. This is a phone conversation?

A. Correct.

Q. And did you ask [the complainant] about this?

A. Yes, I did.

Q. Exactly what did you ask her?

A. I asked her what was going on, and for her to tell me what had happened.

Q. What was [the complainant's] response to that?

A. She said that she made it up, and the only reason she was doing it, because she hated [applicant] and that she wanted him out of her life.

＊　＊　＊　＊　＊　＊

[THE COURT]: All right. Well, I think it's within my discretion to allow him to testify, and I think you can certainly cross-examine him on any anything that's relevant.

[THE PROSECUTION]: Can I make one objection on the record, Your Honor?

[THE COURT]: Yes.

[THE PROSECUTION]: . . .

In addition, they can't be used for impeachment of [the complainant] because when she testified, she admitted on the stand through my questioning that she

had—had told him this, it didn't happen because she was humiliated, so there—there's where I'm—therefore, I'm going to object for those reasons.

[THE COURT]: Y'all want to respond?

[APPLICANT]: Your Honor, actually part of what he's saying is consistent with what [the complainant] testified to. There is some inconsistencies that deal with the aspect of don't tell anybody. Be very secretive about this, and I made it up. And that I hate [applicant], that's the reason I made that up.

So, there is part—part of what the State is objecting to is correct, but I don't know how you're going to segregate those parts out of this, overrule the statement and say that the hearsay stuff stays out, but the prior inconsistencies come in.

[THE PROSECUTION]: Your Honor, I don't feel that they've laid the proper predicate for it to be a prior inconsistent statement. They never went over with [the complainant] whether she did or didn't say—she never said, "No, I didn't say any of those things," because they didn't present the proper questions to lay the predicate for her to then be impeached. They never asked her, "Did you tell him not to tell anyone?"

[APPLICANT]: Well, I can—I can call [the complainant]—call her and ask her that. I mean, that's the way to cure that problem, see what she says about it.

[THE PROSECUTION]: At this point, I object, it is still hearsay.

[THE COURT]: Well, if it's offered to impeach the complainant, then it's not offered for the truth, so it's not hearsay.

[THE PROSECUTION]: But she hasn't said anything inconsistent yet to be impeached with.

[THE COURT]: All right. Well, at this point set your foundational requirements. I think the State is correct. [APPLICANT]: We would—well, we're ready.

Applicant did not recall the complainant to set the "foundational requirements" for impeaching her with Graham's testimony. Specifically, he did not recall the complainant and ask her whether she previously told Graham that she fabricated the allegations against applicant because she hated applicant and wanted him gone. *See* TEX. R.EVID. 613(a) (requirements for impeaching witness with prior inconsistent statement). Instead, the record from applicant's 1997 trial reflects that applicant put Graham on the stand before the jury and unsuccessfully attempted to use Graham's testimony to impeach the complainant without "setting" these "foundational requirements."

**D. Applicant Presents No "New" Evidence**

Applicant does not have any "new" evidence to present. The substance of applicant's "new" evidence set out in the affidavits of the complainant, Starr and Graham is that the complainant fabricated the molestation charges against applicant because she hated him and wanted him gone. But, the record from the habeas hearing reflects that applicant could have discovered Starr's testimony by the time of his 1997 trial. *See Keeter v. State*, 74 S.W.3d 31, 36–37 (Tex.Cr.App.2002) (defendant, seeking new trial based on newly discovered evidence, must show, among other things, that the new evidence was unknown or unavailable at the time of trial and that the failure to discover the new evidence was not due to lack of diligence). And, the record from applicant's 1997 trial reflects that Graham's testimony was known to applicant at the time of trial and that applicant had an opportunity to present this evidence to the jury at his 1997 trial by setting the "foundational requirements" which he made no attempt to do. *See id.* To the extent that the evidence in the complainant's affidavit is "new," it is cumulative of the evidence set out in the affidavits of Starr and Graham which was available to applicant at the time of his 1997 trial. *See id.* (defendant, seeking new trial based on newly discovered evidence, must show that new evidence is admissible and is not merely cumulative).

**V. THE CLAIMED "INCONSISTENT AND IMPLAUSIBLE" TESTIMONY FROM APPLICANT'S 1997 TRIAL**

Applicant, the habeas court and this Court on original submission all claim that much of the testimony from applicant's 1997 trial is "inconsistent and implausible." *See Tuley*, slip op. at 16–17 (agreeing with the habeas court's characterization of the testimony at applicant's 1997 trial as "inconsistent and implausible"). The habeas court made several findings in this regard:

. . . Though this Court could cite to other instances of questionable testimony in the record, it would only serve to catalogue, and not capture, the essentially unreliable nature of the testimony offered for Applicant's guilt. . . .

. . . In recalling this evidence and reviewing the trial record, the Court finds that the evidence of Applicant's guilt is so far outweighed by the evidence of Applicant's innocence as to be almost entirely one-sided. In reaching this conclusion, the Court relies upon the manifestly unreliable and contradictory testimony offered at trial in support of Applicant's guilt.

**A. Dr. Persaud's Testimony**

Dr. Persaud was a physician who examined the complainant about two weeks af-

ter the last claim of molestation at the complainant's home. The habeas court, and this Court on original submission, considered it significant that Dr. Persaud testified at applicant's 1997 trial that there were "[n]o physical findings suggestive of abuse at this time." *See Tuley,* slip. op. at 17. The habeas court found:

Finally, this Court recalls the testimony of the examining physician, Dr. Persaud. Though unwilling to express a definitive statement as to whether her findings were conclusive either way, Dr. Persaud did testify to the fact that she noted "No physical findings suggestive of abuse at this time." (Citation To Record From Applicant's 1997 Trial Omitted).

An independent examination of the record from applicant's 1997 trial, however, indicates that the habeas court's findings do not mention other significant testimony that Dr. Persaud provided. Dr. Persaud also testified that about 85% of the approximately 1,000 sexual abuse examinations Dr. Persaud performed "came out to be normal." Dr. Persaud testified that it would not have been unusual for someone as young as the complainant, who had been molested numerous times for one and-a-half years, to show no physical evidence of sexual abuse. Dr. Persaud testified that her findings did not mean "that there was not any sexual abuse."

Q. Can you please tell the jury what the history was that was given?

A. There was a disclosure about two weeks ago of alleged sexual abuse. The incident happened many times over the past one and-a-half years. The child has allegedly described the sexual abuse that involved penetration.

Q. Once you received that history concerning [the complainant], did you also determine when she had begun to menstruate, and is that contained in your records?

A. Yes.

Q. And when was that?

A. It says 12 years.

Q. And how old was she at the time of your exam?

A. Thirteen and four months.

Q. Did the—did that have any effect on [the complainant's] hymen?

A. Yes.

Q. Can you describe to the jury what you saw during your exam with [the complainant]?

A. That description I had written is folded redundant estrogenized hymen. No tears or scars are seen. I made a note of some elevated, bumpy tissue, but I didn't give an interpretation of what I thought that was.

Q. Can you describe what you mean by estro—that her hymen was estrogenized?

A. The hymen was thickened and folded. If there's a lot of estrogen, it's thickened and folded.

Q. You stated that you did not see any tears or scars?

A. Yes.

Q. Does that mean to you that there was not any sexual abuse?

A. No.

Q. Can you please explain?

A. Common finding for children who have been sexually abused. It's a normal exam.

Q. What do you mean?

A. They—they are typically normal after sexual abuse. We don't typically see signs of trauma. Mostly because our exams are in part—in part done because our exams are done after the disclosure and after—after the last event, so we don't see blood or fresh tears or anything. Healing typically, so—our exams are done so much later. There—the

tissues in that area have distensible, accommodating properties. The amount of penetration is variable. So generally, exams are normal.

The child is of menstruating age. She had a year and-a-half before I saw her. So her—her tissues are even more distensible. The hymen in particular at that angle is very difficult to evaluate once there's been trauma and it has healed, because the folding and thickness of the hymen doesn't allow you to separate out what might have been a little bitty tear that healed altogether. Now, it just looks like other folds. Scar tissue is hard to evaluate. Scar tissue is supposed to be thicker, maybe paler. But the estrogenized hymen is thicker and paler so—so trauma becomes hard to distinguish in a patient of this age. Only—only that which is really bad and very deep lacerations are easily seen after a trauma event. Also, the closer you are to the trauma event, the easier it is to see because it just happened or it's taken time to heal, but once it's healed, it's really hard.

Q. So, for example, if there had been a trauma to [the complainant's] hymen when she was 12, would you expect to be able to see it when she was 13 years and four months?

A. May or may not. Could go either way depending on how severe the trauma was and how well she healed as well.

Q. But you can't say, yes, she was, or no, she wasn't?

A. No.

Q. Dr. Persaud, how many sexual abuse exams have you done of children over the last several years?

A. About a thousand.

Q. And of those thousand, what percentage came out to be normal approximately?

A. 85 percent.

Q. Is that why you—you stated earlier that it's more common to have a normal exam?

A. Yes.

On cross-examination, Dr. Persaud testified to the two major findings in her exam. Only one of these was mentioned in the habeas court's findings.

Q. Okay. Now, on page four of the exam, there's a big block and it says "Impression from the exam."

And it says, "No physical findings suggestive of abuse at this time," period. And, **"Normal genital exam does not rule out abuse;"** [11] is that correct?

A. Yes.

Viewed in its entirety, Dr. Persaud's testimony is not "questionable" or "implausible." On the contrary, Dr. Persaud's testimony demonstrates how the complainant could have been sexually abused as she claimed without showing any physical signs of sexual abuse. *See Elizondo,* 947 S.W.2d at 209 (habeas corpus applicant must clearly and convincingly show that a jury would acquit him).

## B. The Bloody Shirt

The complainant's aunt testified at applicant's 1997 trial that she found a bloody shirt in a box under the complainant's bed after applicant's arrest..

Q. What were you searching for?

A. Any clues to what was—anything that would help us find out what was going on—going on or how it could go on.

Q. And did you find anything?

---

**11.** The habeas court did not mention this emphasized portion of Dr. Persaud's testimony even though it came just after the portion of

Dr. Persaud's testimony that the habeas court did rely on and cite to in its findings.

A. Yes, a shirt under [the complainant's] bed in a box.

Q. And what was the condition of that shirt?

A. There was—it was under a bunch of clothes, and it was bloody. And it was like, wadded in, like, a ball and it was in a plastic bag and had, like, weeds and stuff like it had been in the bushes or something.

Q. And what did you do with that shirt?

A. We took it and showed it to [the mother] and called the detective and asked him if it could be used in evidence. And we asked [the complainant] about it.

Q. And was she able to—without telling me what she said, was she able to give you an explanation as to why the shirt was bloody?

A. Yes.

The complainant testified at applicant's 1997 trial about an incident during a camping trip at a lake in Oklahoma. The complainant recalled that after the assault she used her shirt to wipe blood off of her legs because she was menstruating. She testified that she left the bloody shirt at the scene of the assault but later saw it in a plastic bag in the trunk of the aunt's car.

Q. Would you go on camping trips together?

A. Yes.

Q. Do you recall a time that you went to Oklahoma?

A. (Nods head.)

Q. —to Turner Falls?

A. (Nods head.)

Q. And you were on your period?

A. (Nods head.)

Q. Can you tell me what happened during that trip?

A. Well, there was—it was like we had to go downhill to the creek with the—where the water was passing through.

Q. Who had to go?

A. Well, we were all going down there.

Q. Your mom, [your younger sister], yourself and applicant?

A. Yes.

Q. Okay.

A. And we all were down there. We stayed there for—down there for about maybe an hour or so, and then we headed back up. I was trying to get my clothes back on. And my mom and my sister were already on their way up. And [applicant] was just sitting there not making any attempt to—to go, and I was trying to avoid every chance possible to where I had to be alone with him. And I started my way up to—the hill, and I felt this hand on my foot. And he asked me where I was going. And I just looked at him and rolled my eyes and tried to go back up the hill as fast as I could and—

Q. And then what happened?

A. He pulled me down real fast, and he was just wearing swim trunks, and I was just wearing my bathing suit, and—it's like a tank top kind of, and he—

Q. What did he do to you?

A. He started—put his penis in my vagina again, and—but this time it—it wasn't for very long at all that—because I kicked him on the inside of his leg and that's when he let go. And he—as soon as I pushed him off, I was just laying there and he had already made his way back up. And I—and—and I was in my period at that time, and since I had just left from swimming, I wasn't wearing any pads or anything. And I was—I had blood all over my legs, and so I couldn't let my mom see that, so I had to take off my tank top and, like, I

cleaned it all up, and I just left it there, and then went back to the car.

Q. Did you ever see that tank top again?

A. Yes.

Q. Where did you see it again?

A. The next time I can remember seeing it was in [the aunt's] car in the trunk.

Q. What was it in?

A. A plastic bag.

The complainant later testified on cross-examination that she left the bloody shirt at the scene of the assault in Oklahoma but that she later saw it in the trunk of the aunt's car and later in the trunk of the mother's car. She testified that she did not move the bloody short to these places and she did not know how it ended up under her bed.

Q. You talked about one incident being at the—the abandoned house, so this other time you testify that applicant] put his penis in your vagina at the lake also?

A. Yes.

Q. Did he just put it in once?

A. Yes.

Q. And took it out?

A. Yes.

Q. That was it?

A. Yes.

Q. Now, you testified you were on your period at this time?

A. Yes.

Q. That means you had your menstruation cycle; is that correct?

A. Yes.

Q. You didn't have a Tampon or Kotex or anything like that?

A. I did before I went there, but I took it off when I got in the water—before I got in the water.

Q. Took the Tampon out before you got in the water?

A. Yes.

Q. Now, on the tank top that you wiped the blood up with, did you have a bathing suit on underneath the tank top?

A. Yes.

Q. What color was the tank top? If you remember.

A. It was white and blue polka dots.

Q. Then after you wiped the blood off your legs, you left the polka dot halter top; is that correct?

A. Yes.

Q. And you've seen it again since you saw it in your aunt's car?

A. Yes—no—well—I saw it again after that.

Q. After what?

A. After I saw it in her trunk.

Q. Oh, you've seen it since you saw it in the trunk?

A. Yes.

Q. Okay. Where did you see it then?

A. I saw it in my mother's trunk.

Q. Okay. And are those the only two times you've seen it since?

A. Yes.

Q. Would it surprise you if that tank top were underneath your bed?

A. Would it surprise me?

Q. Yes.

A. Yes.

Q. You didn't put it under your bed in a box, did you?

A. No, I didn't even pick it up to get moved to the—even to the house.

Q. You left it in Oklahoma?

A. Yes.

This Court's opinion on original submission considered the bloody shirt evidence "questionable" because "there was conflicting testimony about a blood-stained shirt

said to have been found by the complainant's aunt." *Tuley*, op. at 396. This Court on original submission stated:

> In another instance, there was conflicting testimony about a blood-stained shirt said to have been found by the complainant's aunt. The complainant testified that she had left the shirt at the scene of an attack in Oklahoma. The complainant's aunt testified that she found the shirt under the complainant's bed in Dallas. She also testified that she offered the shirt to an investigator who said he could not accept it.

*Id.*

The habeas court made findings that the bloody shirt evidence was another example of "implausible" testimony "rife with material contradictions."

> Rife with material contradictions, this Court observed instance upon instance of testimony that either conflicted with testimony given by other State's witnesses, or which was simply implausible. By way of example, this Court can recall the vast inconsistencies in the testimony regarding a blood stained shirt alleged to have been found by [the aunt]. As testified to by [the complainant], this shirt was used to wipe a quantity of blood left on her legs after an assault alleged to have occurred at a lake in Oklahoma. (Citation to Reporter's Record Of Applicant's 1997 Trial Omitted). Despite [the complainant's] testimony that she left the tank top at the scene of the assault, [the aunt] testified that she found this blood soaked shirt under [the complainant's] bed in Dallas. (Citation to Reporter's Record Of Applicant's 1997 Trial Omitted). [The mother] then testified that when this evidence was

offered to the detective, the detective then declined to accept it, stating "he couldn't."(R.R. IV, 104 [12]).

The record from applicant's 1997 trial is not "rife with contradictions" and does not contain "vast inconsistencies in the testimony regarding a blood stained shirt alleged to have been found by [the aunt]." The complainant consistently testified that she left the bloody shirt at the scene of the assault in Oklahoma and that she did not know how the shirt ended up under her bed. The aunt did not contradict the complainant's testimony that she left the bloody shirt at the scene of the assault in Oklahoma and the complainant did not contradict the aunt's testimony that she found the bloody shirt under the complainant's bed. The record from applicant's 1997 trial merely demonstrates a mystery on how the bloody shirt ended up under the complainant's bed. In addition, despite any conflicting evidence on how the bloody shirt ended up under the complainant's bed, a reasonable juror could determine that it is more significant that the complainant truthfully testified that a bloody shirt, in fact, exists. *See Elizondo*, 947 S.W.2d at 209 (habeas corpus applicant must clearly and convincingly show that a jury would acquit him).

### C. The Missing Diary

The record from applicant's 1997 trial reflects that the trial court ordered the complainant to produce her diary. The complainant returned to court the next day and claimed that her house had been burglarized during which the only thing taken was the diary. The trial court decided that this evidence about the missing diary could be presented to the jury.

---

**12.** This citation to the record from applicant's 1997 trial is actually a citation to the aunt's testimony, and it was the aunt (and not the mother as recollected by the habeas court) who testified that she offered the bloody shirt to a detective who said that he could not accept it.

[THE COURT]: All right. Let's go on the record.

As we began this morning, the State notified the Court that yesterday afternoon, as you will recall, I ordered [the complainant] to produce her diary for the Court today. Sometime during the evening hours of last night, apparently the diary was stolen and a police report was filed by [the mother]. According to the police report, the only thing that was taken from the residence was the diary.

Back in chambers the Defense asked the Court to be able to develop that as testimony in from of the jury, and I'm going to let y'all do that, but with these restrictions: I think you can ask—whichever witness you've got—whoever you want to get it in through, you make up our own minds, but I think your entitled to ask: "Was [the complainant] ordered by the Court to bring the diary?" ...

Applicant claimed in his habeas corpus application that the missing diary "was perhaps the most egregious incident of the trial." In his opening remarks to the habeas court at the habeas hearing, applicant's lawyer stated that the complainant testified at applicant's 1997 trial that she kept a diary "containing written recordings of the assaults."

[APPLICANT]: Finally we will ask that you recall your Order to [the complainant] after testifying that—**she had kept a diary containing her impressions or not—excuse me, not her impressions, but containing written recordings of the assaults.** And that the next day [the complainant] and her mother appeared with a story that the diary had been taken—

[THE COURT]: I remember that well.

[APPLICANT]: All right.

—in the burglary, and was the only item taken in the burglary that night.

(Emphasis Supplied).

This Court's opinion on original submission also stated as fact that the complainant testified at applicant's 1997 trial that her diary described "some of the events that formed the accusations against the applicant." *See Tuley,* op. at 396. This Court's opinion on original submission also considered the missing diary evidence as an example of the "inconsistent and implausible testimony" from applicant's 1997 trial. *See id.*

The habeas court also stated as fact that the complainant testified at applicant's 1997 trial that "she recorded some of the events she testified to in a diary that she kept in her home." The habeas court also considered the missing diary evidence as supportive of its finding "that the evidence of [applicant's] guilt was severely deficient" and as serving "to exemplify the overall mendacity that permeated nearly every witnesses [sic] testimony at trial." The habeas court's findings state:

> While Applicant's recitation of the evidence refreshed the Court's recollection in greater detail as to certain pieces of testimony, this Court distinctly recalls some specific aspects of the testimony vividly. **In particular, the Court recalls the testimony of [the complainant] that she recorded some of the events she testified to in a diary that she kept in her home.** (R.R. IV, 148). Subsequent to [the complainant's] testifying to this, defense counsel requested that the diary be produced. (Citation To Record Of Applicant's 1997 Trial Omitted). After this Court ordered [the complainant] and her mother to bring the diary to court with them the next day, [the complainant] and her mother appeared without the diary, at which time they informed the Court that their

home had been burglarized the previous evening, and that the only item taken was the diary. (Citation To Record Of Applicant's 1997 Trial Omitted). While this event is far from determinative of this Court's finding that the evidence of guilt was severely deficient, it does serve to exemplify the overall mendacity that permeated nearly every witnesses [sic] testimony at trial.

(Emphasis Supplied).

It is appropriate to note initially that the record from applicant's 1997 trial indicates that the complainant never testified that her diary described "some of the events that formed the accusations against the applicant." She actually testified before the jury that her diary "just state[d][her] feelings, nothing specific or anything."

Q. Did you write things about any of the incidents that you've testified to in your diary?

A. Yes, I—I—it—all it said—it just states my feelings, nothing specific or anything.

And, later in the hearing outside the jury's presence resulting in the trial court ordering her to bring her diary to court the next day, the complainant testified that she wrote things in her diary about "everyday life."

Q. [Complainant], earlier today you talked about you had a diary that you have at your grandmother's house.

A. Yes.

Q. Is that diary still at your grandmother's house?

A. I'm not sure if it's actually there right now.

Q. Do you know where it is?

A. No—no, not—not right now, I don't.

Q. You could put your finger right on it; is that right?

A. Yes.

Q. Do you think if you went home and looked for it, you'd find it?

A. Yes.

Q. And you said that you wrote things in there; is that correct?

A. Yes.

Q. About like what happened at school or stuff like that?

A. Everyday life.

Q. Everyday life?

A. Yes.

[APPLICANT]: We'd like to have it, Your Honor.

[THE COURT]: All right.

[Naming the complainant], you need to try to find that diary tonight and bring it to court tomorrow. None of us are interested in reading all the details of your personal life, but anything that related to anything that you testified to, [applicant's] entitled to see.

The complainant's mother later testified before the jury at applicant's 1997 trial that the diary was the only thing taken during a burglary. The habeas court's findings, however, do not mention that the mother also testified that applicant's family knew where she lived and that she and the complainant had planned to spend the night with a friend when they discovered the burglary. The habeas court's findings also do not mention that the mother provided uncontradicted testimony that there was physical evidence of a burglary. The complainant's mother was not permitted to testify about "any concerns" she had about applicant's brother knowing where she lived.[13]

---

**13.** The record from a pretrial hearing on the admissibility of extraneous offenses indicates that applicant's brother had been harassing the complainant prior to applicant's 1997 trial.

Q. [The mother], does the [applicant's] family know where you live presently?

A. Yes, they do.

Q. Does his younger brother, Chase, know where you live?

A. Yes, he does.

Q. Since [applicant] has been in jail, have you had any concerns about Chase knowing where you lived?

[APPLICANT]: Your Honor, I would object to the relevance.

[THE PROSECUTION]: I withdraw the question, Your Honor.

[APPLICANT]: I'd ask the jury to be instructed to disregard the question and any answer that might have been made.

[THE COURT]: Well, there was no answer. I'll ask y'all to disregard the question.

Q. What time did you get home last evening—last night?

A. 6:30, quarter to seven.

Q. Where did you go when you got home?

A. We went to my mom's.

Q. And your mom lives?

A. Right next door in the same triplex.

Q. And what happened after you left your mom's?

A. We went to the house to get our stuff ready so we could go spend the night with a friend instead of staying there, and my daughter noticed that the chair was away from the window and—it was against the window.

Q. In what room?

A. In [the complainant's] bedroom.

Q. And was anything else messed up in the room?

A. The blinds were all the way up, and the window was cracked about that far (indicating).

Q. Was anything else misplaced?

A. There was a book in—it's a room that we do not use anymore. It's like a storage room now. And there was a book on the floor, because there's a shelf on top, and it was just laying on the floor and it wasn't laying on the floor before.

Q. Were there any other marks on any other windows?

A. Yes, in the kitchen on the outside.

Q. What was there?

A. I'm sorry.

Q. What marks were there on the window?

A. It looked like somebody was trying—trying to pry the window open, and the [police] officer looked at it, too. He said—

[APPLICANT]: I'll object to the hearsay, Your Honor.

[THE COURT]: Sustained.

The totality and not just selected portions of the missing diary evidence from applicant's 1997 trial indicate that this evidence is not "implausible." A reasonable juror could determine that members of applicant's family might have been highly

---

[THE COURT]: All right. Let's hear about number 12. I'm not sure I know what that means.

[THE PROSECUTION]: Well, this goes to the fact that [applicant's] brother has been harassing [the complainant] in this case since [applicant] has been in jail.

[THE COURT]: Specifically how?

[THE PROSECUTION]: He has been driving by their home and screaming profani-

ties at them. I have—the mother has seen him do this. Neighbors of the mother have seen him do this.

[THE COURT]: How is that relevant to [applicant's] guilt?

[THE PROSECUTION]: At this point, beside the fact that the child is frightened of him, it goes to her state of mind. If the door's opened, it may become relevant.

motivated to obtain the diary and that they might have even had something to do with the missing diary. This would explain why only the diary would have been taken during a burglary of the complainant's home.

These inferences are even more reasonable in light of other evidence at applicant's 1997 trial that the trial court found it necessary to admonish some "unidentified individuals," who apparently were on applicant's witness list, not to harass the victim during the trial. The habeas court's findings do not mention this evidence either.

[THE COURT]: All right. It's come to my attention that there's some improper behavior happening out in the hallway there, and this applies to you. It doesn't apply to you. It doesn't apply to you, but I'm going to tell you right now, it's going to stop.

It was reported to me that when [the complainant] in this case was testifying, that some of you were looking in the back window, and I sent my bailiff out there and he admonished you all not to do that anymore.

And then it was reported to me that there was some conversation going on about, "Let's stare at her. Let's make her feel uncomfortable," or things to that effect.

I'm telling you right now, there's a couple of problems that y'all are going to run into.

Let me tell you first of all, this is a first-degree felony trial. This is serious business. [Applicant] is facing life in prison. Do y'all know that? This isn't fun and games time.

Y'all also—I could hold you in contempt. I could put you in jail or I could fine you; do you understand that?

[UNIDENTIFIED INDIVIDUALS]: (Nod heads in unison.)

[THE COURT]: There's also a felony charge called retaliation that you could be charged with or tampering with a witness or trying to intimidate a witness; do you all understand?

[UNIDENTIFIED INDIVIDUALS]: (Nod heads in unison.)

[THE COURT]: And don't think I won't. I don't want to hear about any more of this going on. I don't want y'all to even so much as look at [the complainant]; do you understand me?

[UNIDENTIFIED INDIVIDUALS]: (Nod heads in unison.)

[THE COURT]: All right. Go back out in the hallway.

[APPLICANT]: Your Honor, I don't believe any of these people are going to be used today. Could we release these witnesses to leave the courthouse and leave the building?

[THE COURT]: Fine with me.

[APPLICANT]: One other matter.

What time do they need to be back tomorrow afternoon.

[APPLICANT]: Tomorrow morning.

[THE COURT]: You instructed the other witness not to wear shorts tomorrow; is that correct?

[APPLICANT]: We told him that.

[THE COURT]: All right. Mr. Francis, you are not free to leave Dallas. Where you go in Dallas, I don't care.[14]

---

**14.** This apparently was the same Mr. Francis who was a friend of the applicant's and who set in motion the chain of events that ultimately resulted in the complainant recanting "everything" that she testified to at applicant's 1997 trial. The boyfriend's affidavit in support of applicant's habeas corpus application states:

   After the trial [the complainant] and I broke up. I was really angry at what had happened, and that she still refused to tell the truth. About a year after the trial,

Even if the complainant made up the story about the burglary and the missing diary, a reasonable juror could also determine that the complainant did so because she did not want to share the secrets of her diary and not because she was afraid that the contents of her diary would prove her a liar or would somehow show applicant's innocence. Applicant has not clearly and convincingly shown that the missing diary evidence is so implausible or was such an "egregious incident of the trial" that a reasonable juror would acquit applicant based on his "new" evidence. *See Elizondo,* 947 S.W.2d at 209.

## VI. CONCLUSION REGARDING APPLICANT'S "NEW EVIDENCE" AND "ACTUAL INNOCENCE"

In conclusion the evidence that applicant presented in support of his habeas application is not "new" and the evidence from applicant's 1997 trial is not "implausible." Much of applicant's case of innocence boils down to a selective and sometimes less than accurate reading of the testimony from his 1997 trial.

In addition, applicant's habeas corpus application and the habeas court's findings

do not mention what perhaps is the most damning and unrecanted evidence of applicant's guilt presented at his 1997 trial.[15] This unrecanted evidence shows that the sexual relationship between applicant and the complainant's mother "pretty much stopped" within a month after applicant moved in. This unrecanted evidence also shows that applicant spent a lot of time alone with the complainant over the next year and-a-half.

It is significant that the complainant stated in her affidavit in support of applicant's habeas corpus application that she did not plan to accuse applicant[16] "until the moment" that the mother asked the complainant whether applicant was abusing her.[17] Since other unrecanted testimony from applicant's 1997 trial is that the mother called the police when the complainant made her outcry statement, then this would have given the complainant less time (than what applicant claimed at trial) to fabricate the details of the molestations before the police began to question the complainant. More unrecanted evidence from applicant's 1997 trial indicates that the complainant told the same basic de-

[applicant's] friend, Tim Francis, contacted me and asked if I was still in touch with [the complainant]. He asked me if I could talk to her about [applicant]. I wrote [the complainant] a letter while she was in [drug] rehab, and mentioned that [applicant] had been sent to prison. We started writing each other, and when she came back to Dallas a month or two later, we talked more about what she had done.

The complainant's affidavit in support of applicant's habeas corpus application states:

Sometime in March or April of 2000, [the boyfriend] wrote me a letter. In it he mentioned that [applicant] had been sent to prison. When I received [the boyfriend's] letter, I was in Shoreline Clinic undergoing treatment for drug addiction. After being released in May 2000, I returned to Dallas. A few months after that a decided to tell the

truth, and on November 1, 2000, I made an affidavit telling what I had done.

15. We would not have learned of this evidence had the habeas record not been supplemented with the record from applicant's 1997 trial.

16. This affidavit is silent on whether the complainant made this outcry statement to the mother at the hotel or somewhere else under completely different circumstances. However, since the testimony from applicant's 1997 trial that the complainant made the outcry statement at the hotel is unrecanted, then we must assume that the hotel scenario is what the complainant's affidavit refers to.

17. One might also wonder why the mother would be asking the complainant this question.

tailed story to two different police officers who questioned her two different times. It would take somewhat of an accomplished liar to do this. Also, and most important, is the fact that applicant pled guilty. Applicant has not unquestionably established his innocence. At best, he has shown that he is probably guilty.

The concurring opinion to the denial of rehearing ("the concurring opinion") suggests that this Court would have independently examined the record from applicant's 1997 trial as required by *Elizondo* had the State made this trial record a part of the habeas record. But, as the moving party on habeas corpus challenging his conviction, applicant (and not the State) bears the burden of making this trial record a part of the habeas record. It is applicant's burden to overcome his conviction which *Elizondo* states "is entitled to the greatest respect." *See Elizondo,* 947 S.W.2d at 209.

And *Elizondo's* mandate requiring this Court to weigh the new evidence of innocence against the evidence of guilt does not involve making credibility and weight determinations as suggested by the concurring opinion. And while one might agree that the State could have done a much better job than it did of showing that applicant is probably guilty, this does not

relieve the Court of its burden to conduct the *Elizondo* analysis which this Court assured the bench and bar it would do when it made its controversial decision in *Elizondo* by a 5–4 vote. *See, e.g., Elizondo,* 947 S.W.2d at 215–16 (Womack, J., dissenting on rehearing).[18]

The concurring opinion mischaracterizes the dissenting opinions on original submission and on rehearing as stating that applicant "may not be guilty of aggravated sexual assault, but he is guilty of perjury, so keep him in prison for aggravated sexual assault." However, neither of these dissenting opinions state or even suggest this. The dissenting opinion on original submission stated that *Elizondo* should not apply to a guilty-pleading habeas corpus applicant because a guilty-plea is a highly significant event in the criminal process that quite validly removes the issue of factual guilt from the case. Contrary to the concurring opinion's characterization, this states that the applicant is "guilty of aggravated sexual assault, so keep him in prison for aggravated sexual assault."[19]

By downplaying the significance of applicant's voluntary guilty plea, the Court makes it easy for this guilty-pleading applicant to excuse that voluntary guilty plea (which applicant now claims was not true), granting him habeas corpus relief based

---

**18.** It should be noted that one of the judges (Holland, J.) who joined the 5–4 majority opinion on original submission in *Elizondo* also voted to grant rehearing in that case "to reconsider the revolutionary and unwarranted procedure that [*Elizondo*] has created." *See Elizondo,* 947 S.W.2d at 216 (Womack, J., dissenting on rehearing, joined by McCormick, P.J., and Keller and Holland, JJ.). The majority opinion on original submission in *Elizondo,* therefore, has the force of law by five shaky votes since Judge Womack's dissenting opinion on rehearing mustered only four votes. *See Reynolds v. State,* 4 S.W.3d 13, 15 (Tex.Cr.App.1999) (explaining the precedential value of a close decision when one of

the judges who joined the majority votes to grant rehearing which is not granted).

**19.** The concurring opinion also speculates on why an innocent person might plead guilty. While one might be sympathetic to these defendants, it must be stated that, as a general rule, for our criminal justice system to function, a guilty-pleading defendant must be held to his unchallenged and voluntary guilty plea unless that plea is set aside. And, our law does not turn a blind eye on such defendants. We have a well-developed body of law which allows these defendants to have their guilty pleas set aside. Until now, putting them back on the streets was not an option.

upon a presentation of "old" evidence (which applicant discovered only after he went to prison) and a selected, inaccurate and misleading presentation of evidence from his trial.[20] This seriously compromises the integrity of the judicial process. If such a guilty-pleading applicant can make a truly persuasive showing of innocence, then he can either seek executive clemency or he can seek to set aside his guilty plea on habeas corpus in this Court. Thus, an applicant like the one here still has options to obtain justice.

The dissenting opinion on rehearing assumes *Elizondo's* application to a guilty-pleading applicant, discussing how applicant's guilty plea should be weighed in the *Elizondo* analysis. In satisfying *Elizondo's* mandate, we would have to recognize

that a rational factfinder could consider applicant's false guilty plea in determining whether he is now telling the truth. In other words, a rational factfinder would have to determine whether applicant is lying now, when he says that he didn't do it, or whether he was lying earlier when he said that he did do it. This dissenting opinion also offers several reasons to explain why applicant's guilty plea might be a reliable indicator of guilt.

The concurring opinion also disagrees with the dissent's recitation of the record facts labeling it as "spin ... placed on the cold record today."[21] This is an odd statement to make since even now a majority of this Court declines to independently examine this record as required by *Elizondo*.[22]

**20.** Applicant mischaracterized the testimony of Dr. Persaud by omitting significant portions of her testimony. Applicant also mischaracterized what actually occurred at his trial vis-a-vis Graham. Graham in fact took the stand outside the presence of the jury to testify about the complainant's recantation soon after applicant's arrest. Applicant neglected to mention other significant evidence from his trial. So even in this habeas proceeding it cannot be said that applicant is being completely truthful and forthcoming to this Court.

**21.** Interestingly, the concurring opinion embraces applicant's "spin" creating a new defensive theory with old evidence that he had an opportunity to present at his trial. That defensive theory is that the complainant all by herself (without the mother's and the aunt's help as originally claimed at trial) falsely accused applicant of molesting her because the complainant (and not the mother as applicant originally claimed at trial) wanted applicant gone. The Great Writ, however, should not be abused to permit a habeas corpus applicant years later to retry a case with old evidence but under a different theory than the unsuccessful one he presented at his original trial. Cf. *Emery v. Johnson*, 139 F.3d 191, 195 (5th Cir.), cert. denied, 525 U.S. 969, 119 S.Ct. 418, 142 L.Ed.2d 339 (1998) (second habeas petition is abuse of the writ if the

prisoner urges grounds that could have been, but were not, raised in his first habeas petition); *Etheridge v. Johnson*, 49 F.Supp.2d 963, 973 (S.D.Tex.1999), dism'd, 209 F.3d 718 (5th Cir.2000), cert. denied, 531 U.S. 945, 121 S.Ct. 344, 148 L.Ed.2d 276 (2000) (habeas petitioner procedurally barred from asserting actual innocence and ineffective assistance of counsel claims based on theories other than those raised in state court) and 49 F.Supp.2d at 979–80 (habeas corpus applicant failed to offer new evidence of innocence not presented at trial but offered only "alternative inferences" which he attempted to draw from the evidence presented at trial).

**22.** Instead, the concurring opinion states that there "are plenty of reasons why intimate relations between two consenting adults may change or stop altogether." This does not mention the other evidence that applicant also began to spend a lot of time alone with the complainant. Of course, there are innocent reasons why this might occur. But, *Elizondo* also requires that we weigh this evidence and the inferences of guilt that it supports against applicant's "new" evidence. What inferences would the reader draw from evidence that applicant had a sexual relationship with the mother that stopped soon after he moved in with the family at which time he began to spend a lot of time alone with the complainant. And,

Also, the record speaks for itself. If comparing the evidence of guilt against the new evidence in determining whether applicant has unquestionably established his innocence equates to placing a "spin" on the record, then *Elizondo* requires that distinctive point of view. It is clear that applicant's "new" evidence is not new or it is cumulative of the evidence that he had an opportunity to present at trial. It is equally clear from independently examining the trial record that the "implausible" evidence from applicant's 1997 trial was actually not so implausible and the concurring opinion does not show otherwise.[23]

What this case boils down to, and what seems to overpersuade the Court, is that applicant's jury was split 10–2 in favor of acquittal. This together with applicant's "new" evidence apparently is what persuades the Court that applicant has unquestionably established his innocence. By denying rehearing and granting the applicant relief this Court has dictated an unfortunate formula for the future: a guilty plea that is later consigned into oblivion versus a recantation forced, false or questionable, equals freedom. That should not be the burden this Court places on the criminal justice system.[24]

Because the Court does not give applicant's error-free conviction the "greatest respect" which *Elizondo* states that it is entitled, I respectfully dissent to the denial of rehearing.

how does *Elizondo* require us to evaluate those inferences against applicant's voluntary admission of guilt. This is the type of process that *Elizondo* requires. This does not necessarily involve only a search for innocent explanations to negate evidence of guilt in support of the complainant's recantation.

23. The concurring opinion does not mention the testimony of Dr. Persaud, the bloody shirt evidence or the missing diary evidence which applicant's habeas lawyer claimed "was perhaps the most egregious incident of the trial" and which figured prominently in the Court's opinion on original submission. Perhaps this is because an independent examination of the record indicates that this incident was not as egregious as we were originally led to believe. The Court at the very least should grant re-

hearing to correct the inaccurate factual statements in its opinion on original submission.

24. The concurring opinion suggests that this dissenting opinion is overly critical of the habeas court and shows no faith in the trial judges of Texas "to discern the difference between meritorious claims and bogus ones." On the contrary, the record reflects that the habeas court conscientiously (though erroneously) evaluated applicant's *Elizondo* claim. This opinion's criticisms are constructively and respectfully leveled at this Court for not doing what it said it would do in *Elizondo* and for permitting this probably guilty applicant to compromise the integrity of the judicial process by making a series of material misrepresentations to this state's courts.